**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

WESTROCK COMPANY and VICTORY
PACKAGING, LP,

       Plaintiffs,

                v.

THOMAS DILLON and CDS MOVING
EQUIPMENT, INC.,

       Defendants.

Civil Action No.    21-cv-5388

## VERIFIED COMPLAINT

Plaintiffs WestRock Company and Victory Packaging, LP ("Victory", collectively with WestRock Company "WestRock" or "Plaintiffs"), by and through their attorneys, Sills Cummis & Gross P.C., for their Verified Complaint against Defendants Thomas Dillon ("Dillon") and CDS Moving Equipment, Inc. ("CDS"), alleges as follows:

## NATURE OF THE ACTION

1. This is an action for equitable and legal relief based on ongoing misconduct by Dillon and CDS. WestRock and CDS are competitors in the market of supplying packaging solutions, equipment, and products.

2. In April 2021, Dillon, a local sales representative for WestRock, resigned from employment with WestRock. He advised WestRock that he was resigning to work for a software company and therefore leaving the packaging industry.

3. WestRock learned that Dillon joined WestRock's competitor, CDS, and has been servicing WestRock's customers whom he had served while in WestRock's employ.

4. WestRock further discovered that Dillon had been forwarding WestRock files, which included proprietary and confidential information about WestRock's customers, to his

personal email account for months prior to his resignation. These files contain WestRock's confidential information and trade secrets, which Dillon and CDS are and have been using to poach WestRock's customers and otherwise unfairly compete with WestRock.

5. Dillon was not authorized to e-mail the files for non-WestRock purposes and was not authorized to retain, use, disclose, or otherwise misappropriate WestRock's confidential information and trade secrets.

6. WestRock has already lost business to CDS due to Dillon's and CDS's misconduct, and unless restrained, will continue to do so and will suffer further irreparable harm.

## THE PARTIES

7. WestRock Company is a publicly traded company formed under the laws of the State of Delaware. Victory is a limited partnership formed under the laws of the State of Texas. WestRock Company is the ultimate parent company of Victory.

8. Dillon is an individual who resides in Elmhurst, Illinois.

9. CDS is a corporation organized and existing under the laws of the State of California with its principal place of business at 375 W Mainville St. Compton, California 90220-5617. Upon information and belief, CDS has offices and/or has employees working in this District, including in Arlington Heights, Illinois.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States and 28 U.S.C. § 1332, because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so related to WestRock's claims arising under the laws of the United States that they form part of the same case or

2

controversy.

11. The Court has personal jurisdiction over Dillon because Dillon is a resident and domiciliary of the State of Illinois.  In addition, the claims asserted herein arise out of the acts and omissions of Dillon committed in the State of Illinois.  The Court has personal jurisdiction over CDS because the claims asserted herein arise out of the acts and omissions of CDS committed in the State of Illinois and/or purposefully directed at the State of Illinois.  The acts described herein were committed intentionally by Defendants, were expressly aimed at the State of Illinois, and were committed with the knowledge that the brunt of the harm was likely to be suffered in the State of Illinois.

12. Venue is proper before the Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

### FACTS COMMON TO ALL CAUSES OF ACTION

**A.  WestRock's Business**

13. WestRock Company is a wholly owned subsidiary of WRKCo, Inc., which is a publicly traded, multinational and multistate provider of paper and packaging solutions for the consumer and corrugated packaging markets.  These entities are collectively referred to as "WestRock" herein.

14. WestRock acquired Victory Packaging in 2018.

15. WestRock is engaged in interstate commerce, with operations in multiple U.S. States and ships products across state lines on a daily or weekly basis.

16. WestRock's business includes the sale of a variety of packaging products, such as boxes, packaging tape, bubble/foam/poly bags, and other packaging equipment and supplies to customers nationally and internationally.

8349333 v1

**B. WestRock's Efforts to Protect Its Confidential Information and Trade Secrets**

17. WestRock invests significant time, resources, and money in protecting its confidential information and trade secrets.

18. Access to WestRock's systems, including email and shared drives, is password protected and controlled by a central administrator. Employees have differing levels of access based on their location and their position.

19. WestRock's sales teams receive automated reports regarding their business and receive access to a password protected business intelligence site in order to manage their business effectively. WestRock limits access to the password protected business intelligence site to those on the sales team and a few support personnel.

20. An employee's access to WestRock's systems, files, and physical spaces is withdrawn upon termination.

21. When employees give notice of impending separation, management assesses risk and determines whether the employee will continue to have access to WestRock's systems during the notice period, or whether the notice period will be abbreviated or eliminated, and the employees access be immediately cut off.

22. WestRock's employees are subject to strict agreements and policies to not disclose confidential information or trade secrets and are generally required to sign confidentiality agreements.

23. WestRock's employees are required to return all devices, documents, and information upon request and/or termination.

24. WestRock's employee policies and agreements impose confidentiality and safeguarding obligations, in addition to those imposed by contract and by the law.

8349333 v1

25. WestRock conducts training for its employees on safeguarding WestRock's confidential information and trade secrets.

26. When WestRock identifies a threat of misappropriation of its confidential information or trade secrets, the threat is dealt with quickly, including through litigation when necessary.

27. WestRock derives a significant benefit from its confidential information and trade secrets and will suffer a significant detriment from misappropriation of its confidential information and trade secrets.

28. WestRock owns and/or lawfully possesses confidential information and trade secrets. Neither Dillon nor CDS owns, lawfully possess, or have any right or authorization to use any of WestRock's confidential information or trade secrets.

**C. CDS Competes with WestRock**

29. CDS is an entity operating in the packaging industry. CDS operates as a business to business supplier of moving equipment and packaging material.

30. WestRock and CDS are competitors in the packaging sales business. WestRock and CDS compete to sell packaging materials to customers.

31. The current President of CDS is Richard Bruns ("Bruns"), who assumed that position in or around April 2020. Prior to joining CDS, Bruns was an employee of WestRock. WestRock terminated Bruns' employment effective November 6, 2019.

32. Bruns's employment experience with WestRock and its predecessor entities began in 1998 and spanned over 21 years.

33. Bruns worked closely with Dillon during Dillon's tenure at WestRock and its predecessor entities.

34. The Bruns and WestRock separation was not a happy one.

8349333 v1

**D. Dillon's Tenure with WestRock**

35. Dillon initially became an employee of Victory in its Chicago branch on May 23, 2011, as a local sales representative. Dillon resigned from his employment with Victory on December 1, 2014. Dillon was re-hired as a local sales representative by Victory at its Chicago location on December 13, 2017. At the time Dillon was re-hired, Bruns was an Executive Vice-President of Moving & Storage Sales for Victory. Bruns was actively involved in Dillon's re-hiring to Victory, including seeking and obtaining approval from Victory's President for Dillon to be rehired.

36. When Victory was acquired by WestRock in 2018, Dillon and Bruns became employees of WestRock.

37. Dillon resigned from Victory on April 21, 2021.

38. Throughout his tenure at WestRock and its predecessor entities, Dillon was based in Illinois, in the Chicago area.

39. Throughout his tenure at WestRock and its predecessor entities, Dillon focused on sales in the Chicago region, but also made sales throughout Illinois, in the Madison Wisconsin area, and in parts of Iowa.

**E. The Confidentiality Agreement**

40. On February 21, 2019, Dillon electronically signed the WestRock Employee Agreement Regarding Confidentiality, Inventions, Works, Computer Software, and Permissions (the "Confidentiality Agreement"). A true and correct copy of the Confidentiality Agreement and Dillon's digital acknowledgment thereof are collectively attached hereto as Exhibit A.

41. In the Confidentiality Agreement, Dillon expressly acknowledged that WestRock's "business relies upon use and protection of [its confidential information and trade

6

secrets]…and that improper use or disclosure will harm WestRock and others."

42. The Confidentiality Agreement defines and describes "Confidential Information," which includes trade secrets as defined by applicable law.

43. Dillon expressly agreed, in relevant part, as follows regarding WestRock's Confidential Information:

> **2.2 <u>Duty to Protect Confidential Information.</u>** During my employment by WestRock, and for a period of five (5) years after cessation of that employment for any reason (the "Confidentiality Period"), I will not, directly or indirectly, divulge or make use of any Confidential Information of WestRock other than in the performance of my duties for WestRock and for the benefit of WestRock. While employed by WestRock, I will make all reasonable efforts to protect and maintain the confidentiality of the Confidential Information of WestRock and follow all policies and procedures established by WestRock with respect to its Confidential Information. In the event that I become aware of any unauthorized use or disclosure of the Confidential Information during the Confidentiality Period, whether intentionally or by accident, I will promptly notify WestRock. This Agreement does not limit the remedies available to WestRock under common, civil or statutory law as to trade secrets or other types of confidential information, which may impose longer duties of not to use or disclose such information.

> **2.3 <u>When I Leave</u>.** Upon cessation of my employment for any reason, I will: (a) promptly deliver to WestRock and not keep, copy, store, retain or take for any purpose any information provided to me or which I developed or collected in the course and scope of my employment, whether or not I consider such information to be Confidential Information; (b) certify in writing that I have complied with this provision if so requested by WestRock; (c) promptly identify and disclose to WestRock all passwords I have been given or which I created to access WestRock systems, and (d) attend an exit interview if so requested by WestRock where such matters may be discussed.

44. Dillon expressly agreed that "[v]iolation or threatened violation of any provision of [the Confidentiality] Agreement may cause immediate and irreparable harm to WestRock. In such event, in addition to any disciplinary action, including termination, that WestRock

7

8349333 v1

may impose, WestRock is entitled to equitable and injunctive relief (for example, a court order compelling compliance or prohibiting activity) without having to post bond or demonstrate inadequacy of money damages. Such relief shall be in addition to any other relief available to WestRock."

**F. Dillon's Job Duties and Access to WestRock's Confidential Information and Trade Secrets**

45. On or about December 13, 2017, Dillon became re-employed as a local sales representative. In this position, Dillon was responsible for managing existing customer accounts and establishing new accounts by prospecting and engaging new customers.

46. As a local sales representative, Dillon's role required access to, among other data, WestRock's internal product information, customer preferences, contract information, and pricing structure, in order to address inquiries from prospective customers, as well as to maintain existing customer accounts. Dillon had to manage customer engagements through the sales lifecycle to ensure that contractual obligations were met and to enable customer satisfaction. Dillon's role required that he develop and execute account strategies for new and existing customers.

47. As a local sales representative, Dillon had access to WestRock's confidential information and trade secrets, including without limitation:

   a. WestRock's communications with customers;

   b. Compilations of WestRock's customer information, volumes, and contract dates;

   c. Details of WestRock's contractual arrangements with its customers and suppliers, including contractual terms, contract pricing, expiration dates, renewal information, tonnage/volume preferences, and more;

   d. WestRock's costs, margins, profits, discounts, and other financial information; and

8349333 v1

e.  WestRock's projections concerning sales, purchases, revenue, profit, margins, and more.

48. Both before and after Dillon gave notice of his resignation to WestRock, he sent numerous WestRock email messages (with their attachments) and other WestRock files to his personal email account.  These documents included information regarding WestRock's sales, customer contracts, delivery/purchase information, order logs, stock lists, and pricing information for customers, including a new customer contract on the day he turned in his equipment.

49. Due to Dillon's representation that he was leaving the industry, he was permitted to retain access to WestRock's systems after giving notice of his separation.

50. Dillon inappropriately used his personal email address to communicate with customers, and he retained such information following his resignation from WestRock.

51. After his resignation, WestRock could not locate several customers' contact information for the customers serviced by Dillon during his tenure.  WestRock had to contact Dillon post-separation to request the return of the customer list and customer contact information that Dillon took with him without authorization.  On April 28, 2021, Dillon provided a list of approximately 83 separate email addresses for customer points of contact that he stored in his personal device(s), as well as additional customer contact information and other proprietary information related to customers of WestRock.

52.  Upon information and belief, Dillon has retained this contact information and is continuing to use WestRock's contacts for the benefit of CDS and to the detriment of WestRock.

**G.  Bruns Solicits Dillon to CDS.**

53. Dillon and Bruns had a long standing relationship while at WestRock. Upon information

8349333 v1

and belief, they continued to maintain a relationship after Bruns was terminated from WestRock and began work at CDS as that company's President.

54. Bruns was knowledgeable about Dillon's contractual obligations to WestRock as a result of his involvement in the terms and conditions of Dillon's re-hiring in December 2017.

55. Bruns was also knowledgeable about Dillon's access to WestRock's Confidential Information, including customer information.

56. Upon information and belief, Bruns recruited and solicited Dillon to resign from WestRock and join CDS.

**H. Unauthorized Use and Access of Email and Retention of WestRock Confidential Information and Trade Secrets by Dillon**

57. For many months prior to his April 21, 2021 resignation from WestRock, Dillon emailed a large number of files containing WestRock's confidential information and trade secrets to himself, and also inserted at least two USB devices into his laptop in April 2021, once before his resignation and once after. Many of the files that he emailed to his personal email account concern WestRock's customers and operations, including confidential customer purchasing, pricing, and contract details.

58. Many files that he e-mailed to himself include, among other things, compilations of confidential information prepared by WestRock that pertain to various customers and/or lists of proprietary WestRock information, which, if used by a competitor, would disadvantage WestRock and benefit a competitor. For example, on February 1, 2021, Dillon emailed to his personal email documents containing WestRock customer contact information, as well as other confidential and proprietary information related to those customer's sales history and terms with WestRock (collectively, the "February 1, 2021 Emailed Files").

8349333 v1

a. On February 1, 2021, at 11:37 AM, Dillon emailed to himself an untitled email with a WestRock Excel file attached titled "Copy of Mover List 12-21-17" that included the names, addresses, telephone numbers and a description of certain payment terms among other information for two-hundred and nine (209) WestRock customers with addresses in Illinois, Indiana, Wisconsin, Missouri, New Jersey, Iowa, Texas, Louisiana, Ohio, Michigan, New York, Delaware, and Georgia. Many of these customers were outside of Dillon's sales area.

b. On February 1, 2021 at 3:56 PM, Dillon emailed to himself an untitled email with six (6) WestRock Excel files attached: (1) a file named "chicago movers.xlsx" listing the names and contact information for seventeen (17) WestRock customers in Chicago, Illinois; (2) a file named "inter western subs movers.xlsx" that included the names, addresses, telephone numbers and "spend" for twenty-five (25) WestRock customers in Illinois, including total spend for these customers; (3) a file named "milwaukee movers.xlsx" that included the names, addresses, telephone numbers and "spend" for twenty-five (25) WestRock customers in Wisconsin including total spend for these customers; (4) a file named "northwest movers.xlsx" that included the names, addresses, telephone numbers and "spend" for fifteen (15) WestRock customers in Illinois, including total spend for these customers; (5) a file named "skokie movers.xlsx" that included the names, addresses, telephone numbers thirteen (13) WestRock customers in Illinois; and (6) a file named "Western subs MOVERS.xlsx" that included the names, addresses, telephone numbers and "spend" for seventeen (17) WestRock customers in Illinois, including total spend for these customers.

8349333 v1

    c. On February 1, 2021, at 4:08 PM, Dillon emailed to himself an untitled email with two WestRock Excel files attached: (1) a file named "Chicagoland Milwaukee Movers.xlsx" that included the names, addresses, telephone numbers and "spend" for one-hundred fifteen (115) WestRock customers in Illinois and Wisconsin (the "Chicagoland Milwaukee Movers File"); and (2) a file named "n windy southside chicago movers.xlsx" that included the names, addresses, telephone numbers and year to date sales for twenty-one (21) WestRock customers in Indiana and Illinois (the "N Windy Southside Chicago Movers Files").

59. For many months leading up to his resignation, Dillon emailed to himself many other confidential and proprietary WestRock documents, including, but not limited to, the following:

    a. On March 15, 2021, Dillon emailed to his personal email account an email with the subject "FW: Customer Price List", which was a forward of an email attaching WestRock's Customer Price List dated March 15, 2021, listing sixty-eight (68) different Victory (WestRock) products.

    b. On March 31, 2021, Dillon emailed to his personal email account an untitled email attaching two WestRock Excel files: (1) a file titled "sales local.xlsx", which listed customer sales information for six hundred and twenty-seven (627) WestRock customers, listing, among other information, the cost center, customer name, WestRock customer number, sales last year, month to date, sales month to date, quarterly last year, month to date, gross profits, last year, month to date, gross profits percentages month to date, as well as additional detailed sales and buying histories for these customers ranging from June 2020 to May 2021 for each of these

8349333 v1

customers; and (2) a file titled "sales overall.xlsx", which listed customer sales information for twenty-two (22) WestRock customers, listing, among other information, the customer group, customer name, sales last year, month to date, sales month to date, quarterly last year, month to date, gross profits, last year, month to date, gross profits percentages month to date, as well as additional detailed sales and buying histories for these customers ranging from June 2020 to May 2021 for each of these customers.

c.   On April 8, 2021, Dillon emailed to his personal email account an email with the subject "Fw: STOCK LIST - CHICAGO 04-08-21.xlsx", which was a forward of an email attaching an Excel file of WestRock's Stock Item Listing as of April 8, 2021, which listed approximately eighty-nine (89) WestRock products with detailed descriptions, specifications, cost information, and profit margins among other confidential and proprietary information about those products.

60. As a result of an ongoing forensic examination of Dillon's WestRock laptop, WestRock has information reflecting that Dillon accessed WestRock files after his resignation from WestRock, even though Dillon refused to assist WestRock in the transition of his customers after he resigned, and therefore had no legitimate business reason to access such files.

61. Further, after his resignation and in the days leading up to his resignation, Dillon inserted at least two electronic devices into his WestRock laptop that he did not turn in.

62. Upon information and belief, Dillon inserted a device(s) into his WestRock laptop to copy WestRock's confidential information and trade secrets onto the device(s) and to use those materials to the benefit of himself and CDS.

63. Specifically, WestRock has determined that the most recent times that Dillon inserted the

devices were into his WestRock laptop were as follows: (1) April 8, 2021 – Verbatim Store "n" Go USB Device; and (2) April 27, 2021 – an iPhone.

64. Dillon was creating, accessing, printing, and/or modifying numerous other WestRock files in the months leading up to his resignation, which, upon information and belief, he accessed, copied or viewed for the purpose of taking such information for use at CDS.

## I. Unfair Competition by Dillon and CDS

65. Upon information and belief, prior to the termination of his employment with WestRock, Dillon began informing WestRock's customers and other key contacts of his impending defection to CDS.

66. Upon information and belief, prior to the termination of his employment with WestRock, Dillon began soliciting WestRock's customers to purchase products from CDS.

67. Upon information and belief, in engaging in the foregoing acts, Dillon knowingly and intentionally used and disclosed WestRock's confidential information and trade secrets to benefit CDS at the expense of and to the detriment of WestRock.

68. Upon information and belief, since the termination of his employment with WestRock, Dillon has used and disclosed WestRock's confidential information and trade secrets to benefit CDS at the expense of and to the detriment of WestRock.

69. Upon information and belief, Dillon is continuing to use, disclose, and otherwise misappropriate WestRock's confidential information and trade secrets to benefit CDS at the expense of and to the detriment of WestRock.

## J. Dillon and CDS Poach WestRock's Customers

70. It became evident after Dillon's separation from WestRock that WestRock's customers were entering into contracts with CDS through Dillon and either lessening or ceasing their

14

business relationships with WestRock.

71. The WestRock confidential information and trade secrets Dillon misappropriated from WestRock include information and trade secrets related to some of these very same WestRock customers.

72. For example, in February and March 2021, Dillon emailed to his personal email account from WestRock's systems several files pertaining to a customer ("Customer A"), including, but not limited to, the following:

    a. On February 22, 2021, Dillon emailed to his personal email account an email titled "print card" attaching a file containing a sample packaging box layout for Customer A, with Customer A's logo on it ("Customer A Box Layout Email").

    b. On March 15, 2021, Dillon sent an email titled "[Customer A] forms" to recipients at Customer A, and copied his personal email account. That email contained three attachments: (1) an order form, (2) the current price list for prices on sixty-eight (68) different Victory (WestRock) products, and (3) a consignment count report from February 2021.

    c. March 16, 2021, Dillon sent an email titled "FW [Customer A]" to himself, which included an attachment with 7 separate invoices for Customer A dated February 23, 2021 (three orders), March 2, 4, 9, and 15, 2021, respectively.

    d. On March 30, 2021, Dillon sent an email titled "FW: March 2021 Consignment Invoice" to a recipient at Customer A, and copied his personal email account. That email contained an attachment with two documents, (1) a March 26, 2021 invoice; and (2) a consignment list of inventory from February 24 to March 26, 2021.

73. Other files that Dillon created, accessed, printed or modified from WestRock's systems in

8349333 v1

the months before his leaving to work for CDS contain additional WestRock confidential information and trade secrets related to Customer A which, upon information and belief, he accessed, copied or viewed for the purpose of taking such information for use at CDS.

74. A few weeks prior to his resignation, Dillon told WestRock that Customer A was taking a substantial amount of its business not to CDS but to another competitor in the industry.

75. Following Dillon's departure from WestRock, WestRock's business with Customer A considerably decreased. Accordingly, deliveries from WestRock to Customer A had lessened considerably and were comprised primarily of outstanding orders made prior to Dillon's departure to CDS.

76. In mid-June, a WestRock employee made one of the first deliveries that employee could recall making to Customer A since Dillon's departure. That employee learned during that visit from a person associated with Customer A that Dillon had made arrangements prior to his resignation from WestRock to continue to serve Customer A when he went to work at CDS. The same WestRock employee subsequently learned similar information from a former employee of Customer A. The WestRock employee reported this information to WestRock management.

77. On a customer call to Customer A's business in the Chicago area in late June, two other WestRock employees observed that CDS materials were in Customer A's warehouse and took photos of some of those materials. An employee at Customer A confirmed to the two WestRock employees that Dillon was continuing to service Customer A on behalf of CDS.

78. Based on the photos taken while at Customer A's warehouse, it appears that CDS is using WestRock's artwork and printing layout on the boxes it printed for Customer A. This is the same layout that Dillon sent to his personal email account in the Customer A Box

8349333 v1

Layout Email. By taking WestRock's work product, CDS was able to dramatically shorten the time it takes to get printed boxes in place for Customer A in time for the peak mover season of the summer months.

79. WestRock's business with Customer A continues to be greatly reduced as a result of Dillon taking this customer's business to CDS.

80. Dillon also put himself in a position to poach Customer A by taking extraordinary steps to secure this WestRock customer's personal relationship with him as he prepared to leave WestRock and join CDS. For example, in late March 2021, Dillon sent an email requesting that WestRock prepare boxes for Customer A. When asked by a WestRock employee who was assisting on the matter whether Dillon had a supporting purchase order form or other document from the client, Dillon responded that he would be paying for the boxes out of pocket because he was working on a charity event with Customer A. While WestRock graciously sponsors customer events, a sales person would typically request approval for the company to cover the costs of sponsorship opportunities where WestRock would be the sponsor. In this extraordinary instance, Dillon represented that he was personally paying hundreds of dollars out of pocket to personally pay for supplies for Customer A's charity event.

81. In April 2021, Dillon emailed to his personal email account from WestRock's systems files pertaining to customer ("Customer B"). Specifically, on April 21, 2021, the day that Dillon resigned, Dillon emailed to his personal email address an email titled "FW: [Customer B] M&S - New agreement" with 3 attachments:

    a. The 2021 executed agreement between Customer B and WestRock, with an attached price list.

    b.   A copy of the WestRock Price List for Customer B dated April 16, 2021; and

    c.   An email from a regional account representative at WestRock to a representative at Customer B, which lists "the remaining Victory locations that have or don't have any [Customer B] printed inventory", as stated in pertinent part in the body of said email. Significantly, Dillon is not copied on that email and it is unclear how he would have a copy of this email if he was neither a sender nor recipient.

82. Other files that Dillon created, accessed, printed or last modified from WestRock's systems in the months before his leaving to work for CDS contain additional WestRock confidential information and trade secrets related to Customer B which, upon information and belief, he accessed, copied or viewed for the purpose of taking such information for use at CDS.

83. Following Dillon's departure from WestRock, WestRock's business with Customer B considerably decreased.

84. On a customer call to Customer B's business in the Chicago area in late June, two WestRock employees confirmed that a representative of Customer B was aware that Dillon was currently working at CDS. While the representative neither confirmed nor denied that Dillon was continuing to service Customer B on behalf of CDS, WestRock believes this is happening upon information and belief. Indeed, sales from WestRock to Customer B declined significantly after Dillon's departure and WestRock has no reason to suspect that such decline in business is attributable to any reasons other than Dillon servicing the customer on behalf of CDS.

85. WestRock's business with Customer B continues to be greatly reduced as a result of Dillon taking this customer's business to CDS.

86. Dillon also emailed to his personal email address confidential information and trade secrets

related to Customer C and Customer D, which were included among the February 1, 2021 Emailed Files and others.

87. Other files that Dillon created, accessed, printed or last modified from WestRock's systems in the months before his leaving to work for CDS contain additional WestRock confidential information and trade secrets related to Customer C and/or Customer D which, upon information and belief, he accessed, copied or viewed for the purpose of taking such information for use at CDS.

88. Following Dillon's departure from WestRock, WestRock's business with Customer C considerably decreased.

89. On a customer call to Customer C's business in the Chicago area in late June, two WestRock employees confirmed with a representative of Customer C that Dillon was continuing to service Customer C on behalf of CDS.

90. WestRock's business with Customer C continues to be greatly reduced as a result of Dillon taking this customer's business to CDS.

91. Following Dillon's departure from WestRock, WestRock's business with Customer D considerably decreased.

92. On a customer call to Customer D's business in the Chicago area in late June, two WestRock employees confirmed with a representative of Customer D that Dillon was continuing to service Customer D on behalf of CDS. The two WestRock employees observed that CDS materials were in Customer D's warehouse and took photos of those some of materials. An employee at Customer D also showed these two employees copies of CDS invoices to Customer D, including invoices dated May 12 and May 27, 2021 that listed the salesperson for CDS as "0050". The employees confirmed with Customer D that

salesperson "0050" referred to Dillon. It is not customary in the industry to list a salesperson by number rather than name. Upon information and belief, listing Dillon as salesperson "0050" rather than by his name is evidence of Dillon and CDS's efforts to hide their improper actions and unfair competition with respect to WestRock's customers.

93. WestRock's business with Customer D continues to be greatly reduced as a result of Dillon taking this customer's business to CDS.

94. Upon information and belief, Dillon and CDS used and/or are using WestRock's confidential information and trade secrets to contact, solicit, market to, negotiate with, and secure contracts with and orders from these and other WestRock customers.

95. Upon information and belief, but for the use by Dillon and CDS's use of WestRock's confidential information and trade secrets, these and other WestRock customers would have continued their contracts/current business relationships with WestRock.

**K. Dillon Will Inevitably Disclose WestRock's Confidential Information and Trade Secrets to and for CDS**

96. Because of the nature of the confidential information and trade secrets Dillon possesses, the position Dillon holds with CDS, and the potential competitive value to CDS of WestRock's confidential information and trade secrets, it is likely and inevitable that Dillon will use, disclose, and otherwise misappropriate WestRock's confidential information and trade secrets, in violation of Dillon's contractual confidentiality obligations and his obligations under law.

97. Because of the nature of the confidential information and trade secrets Dillon has disclosed to CDS, and the potential competitive value to CDS of WestRock's confidential information and trade secrets, it is likely and inevitable that CDS will use, disclose, and otherwise misappropriate WestRock's confidential information and trade secrets, in

8349333 v1

violation of CDS's obligations under the law.

**L. WestRock Has Suffered Irreparable Harm, and Will Suffer Irreparable Harm, from Dillon's and CDS's Misconduct**

98. As a direct result of the misconduct of Dillon and CDS described above and herein, WestRock has suffered irreparable harm, including but not limited to:

    a. Loss of future business opportunities;

    b. Loss of customers and other goodwill;

    c. Loss of market share; and

    d. Competitor use of its confidential information and trade secrets, including the attendant loss of the exclusivity, confidentiality, secrecy, and other valuable properties.

99. Absent injunctive relief and an immediate cessation of misconduct by Dillon and CDS, and as a direct result of likely and inevitable future misconduct by Dillon and CDS, WestRock will suffer irreparable harm, including but not limited to:

    a. Loss of future business opportunities;

    b. Loss of customers and other goodwill;

    c. Loss of market share; and

    d. Competitor use of its confidential information and trade secrets, including the attendant loss of the exclusivity, confidentiality, secrecy, and other valuable properties.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1831 *et seq.***
**(AGAINST ALL DEFENDANTS)**

100. WestRock incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

21

101.    WestRock took reasonable steps, and invested significant time, resources, and money, in protecting and safeguarding its trade secrets.

102.    WestRock derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets outside of its business. WestRock's trade secrets are highly confidential.

103.    WestRock's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

104.    WestRock's trade secrets are used in interstate and foreign commerce and relate to products and services that are in interstate and foreign commerce.

105.    While Dillon was employed by WestRock, WestRock provided Dillon access to WestRock's trade secrets in confidence, subject to confidentiality agreements/restrictions, and subject to other safeguards.

106.    Dillon has misappropriated and/or will misappropriate WestRock's trade secrets by retaining them after the end of his employment with WestRock, using them for his own and CDS's purposes, and disclosing them to CDS and others.

107.    Dillon knew, and knows, that he may not misappropriate, disclose, or use WestRock's trade secrets for his or anyone's purposes other than those of WestRock.

108.    The conduct of Dillon has been, and is, knowing, willful, malicious, wanton, and intended to damage the business of WestRock.

109.    The conduct of CDS has been, and is, knowing, willful, malicious, wanton, and intended to damage the business of WestRock.

8349333 v1

110.     As a result of the conduct of Dillon and CDS, WestRock has suffered, and continues to suffer, irreparable harm.

111.     As a result of the conduct of Dillon and CDS, WestRock has suffered, and continues to suffer, damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE ILLINOIS TRADE SECRETS ACT, 765 ILCS § 1065/1, *et seq.***
**(AGAINST ALL DEFENDANTS)**

112.     WestRock incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

113.     WestRock took reasonable steps, and invested significant time, resources, and money, in protecting and safeguarding its trade secrets.

114.     WestRock derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets outside of its business.  WestRock's trade secrets are highly confidential.

115.     WestRock's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

116.     While Dillon was employed by WestRock, WestRock provided Dillon access to WestRock's trade secrets in confidence, subject to confidentiality agreements/restrictions, and subject to other safeguards.

117.     Dillon has misappropriated and/or will misappropriate WestRock's trade secrets by retaining them after the end of his employment with WestRock, using them for his own and CDS's purposes, and disclosing them to CDS and others.

118.     Dillon knew, and knows, that he may not misappropriate, disclose, or use

23

WestRock's trade secrets for his or anyone's purposes other than those of WestRock.

119.     Upon information and belief, other employees of CDS have used, disclosed, and otherwise misappropriated WestRock's trade secrets for purposes other than those of WestRock, all with the knowledge that their use, disclosure, and other misappropriation has not been authorized by WestRock.

120.     The conduct of Dillon has been, and is, knowing, willful, malicious, wanton, and intended to damage the business of WestRock.

121.     The conduct of CDS has been, and is, knowing, willful, malicious, wanton, and intended to damage the business of WestRock.

122.     As a result of the conduct of Dillon and CDS, WestRock has suffered, and continues to suffer, irreparable harm.

123.     As a result of the conduct of Dillon and CDS, WestRock has suffered, and continues to suffer, damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT (AGAINST DILLON)

124.     WestRock incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

125.     The Confidentiality Agreement is a valid and enforceable agreement between WestRock and Dillon, and Dillon's relevant obligations thereunder survived the termination of his employment with WestRock.

126.     WestRock duly performed all of its obligations under the Confidentiality Agreement.

127.     Dillon breached the Confidentiality Agreement by, *inter alia*:

     a.  Failing to protect and hold in trust and strictest confidence all WestRock

24

confidential information and trade secrets;

b. Using WestRock confidential information and trade secrets other than for WestRock's benefit, including using, disclosing, and giving to others WestRock confidential information and trade secrets for purposes other than WestRock's legitimate business purposes;

c. Failing to deliver to WestRock all WestRock confidential information and trade secrets upon the termination of his employment with WestRock; and

d. E-mailing, keeping, copying, storing, retaining and/or taking WestRock's confidential information and trade secrets, including after the termination of his employment with WestRock.

128.    As a result of Dillon's conduct, WestRock has suffered, and continues to suffer, irreparable harm.

129.    As a result of Dillon's conduct, WestRock has suffered, and continues to suffer, damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY (AGAINST DILLON)

130.    WestRock incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

131.    By virtue of his employment with and position at WestRock, Dillon owed WestRock a fiduciary duty, including a duty of undivided loyalty.

132.    The duty of loyalty Dillon owed to WestRock includes the duty to act with utmost fidelity, integrity, and honesty, the duty not to act in concert with others in any manner contrary to the interests of WestRock, and the duty to disclose to WestRock any knowledge of matters that may harm the interests of WestRock.

133.    While employed by WestRock, Dillon breached his fiduciary duty, including his duty of loyalty, by, *inter alia*:

    a.    Upon information and belief, poaching WestRock's customers and other business;

    b.    Planning to email, copy, retain, use, disclose, and otherwise misappropriate WestRock's confidential information and trade secrets, all without authorization;

    c.    Emailing, copying, retaining, using, and disclosing WestRock's confidential information and trade secrets for the benefit of CDS and at the expense of and to the detriment of WestRock; and

    d.    Beginning at least as early as February 2021, and potentially many months before, Dillon was a faithless servant who was no longer acting in WestRock's interests.

134.    As a result of the conduct by Dillon, WestRock has suffered, and continues to suffer, irreparable harm.

135.    As a result of the conduct by Dillon, WestRock has suffered, and continues to suffer, damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS (AGAINST ALL DEFENDANTS)

136.    WestRock incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

137.    Dillon and CDS are, and have been, aware that WestRock enjoys advantageous business, economic, and contractual relations with its customers.

138.    Dillon and CDS are, and have been, aware that WestRock has a reasonable likelihood of continuing, future, and prospective advantageous business, economic, and contractual relationship with its customers.

139.    Dillon and CDS are, and have been, aware, that Dillon has contractual and legal

8349333 v1

obligations prohibiting him from using, disclosing, or otherwise misappropriating WestRock's confidential information and trade secrets for purposes other than to benefit WestRock, including interference with WestRock's relations with its customers.

140.     Dillon and CDS intentionally interfered with WestRock's existing, continuing, future, and prospective business, economic, and contractual relations with its customers by, *inter alia*:

   a.  Soliciting WestRock's customers to terminate, not enter into, and/or diminish their existing, continuing, future, and prospective business, economic, and contractual relations with WestRock; and

   b.  Using WestRock's confidential information and trade secrets to solicit WestRock's customers.

141.     Dillon and CDS are, and have been, aware that the foregoing conduct violates Dillon's contractual obligations to WestRock.

142.     Dillon and CDS have acted without privilege or justification.

143.     The conduct of Dillon and CDS has been, and is, knowing, willful, malicious, wanton, and intended to damage the business of WestRock.

144.     As a result of the conduct of Dillon and CDS, WestRock has suffered, and continues to suffer, irreparable harm.

145.     As a result of the conduct of Dillon and CDS, WestRock has suffered, and continues to suffer, damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, WestRock prays for and respectfully requests judgment in WestRock's favor and against Dillon and CDS as follows:

27

A.     Granting temporary, preliminary, and permanent injunctions enjoining and restraining Dillon from:

    i.    Disclosing, using, or otherwise misappropriating WestRock's confidential information and trade secrets;

    ii.   Directly or indirectly communicating with, marketing to, purchasing from, selling to, networking with, or otherwise engaging in any business activities with any individual or entity who is the subject of any confidential information or trade secret information that Dillon obtained from WestRock; and

    iii.  Violating any obligation under the Confidentiality Agreement;

B.     Granting temporary, preliminary, and permanent injunctions requiring Dillon to conduct a thorough, good faith search for WestRock's property, including files and documents, that may be in Dillon's possession, custody, or control, including any confidential information or trade secrets, and to return all such material to WestRock;

C.     Granting temporary and preliminary injunctions requiring Dillon to facilitate WestRock's search and forensic examination of any and all repositories of electronically stored information in Dillon's possession, custody, or control that may contain any WestRock confidential information or trade secrets;

D.     Granting temporary, preliminary, and permanent injunctions enjoining and restraining CDS from:

    i.    Disclosing, using, or otherwise misappropriating WestRock's confidential information and trade secrets;

    ii.   Directly or indirectly communicating with, marketing to, purchasing from, selling to, networking with, or otherwise engaging in any business activities with any

8349333 v1

individual or entity who is the subject of any confidential information or trade secret information that Dillon obtained from WestRock;

E.      Granting temporary, preliminary, and permanent injunctions requiring CDS to conduct a thorough, good faith search for WestRock's property, including files and documents, that may be in CDS's possession, custody, or control, including any confidential information or trade secrets, and to return all such material to WestRock;

F.      Granting temporary and preliminary injunctions requiring CDS to facilitate WestRock's search and forensic examination of any and all repositories of electronically stored information in CDS's possession, custody, or control that may contain any WestRock confidential information or trade secrets;

G.      Ordering disgorgement and requiring Dillon to repay to WestRock the value of his salary, benefits, and other compensation during his period of faithless service and/or disloyalty to WestRock;

H.      Ordering disgorgement and requiring Dillon and CDS to pay to WestRock the value of all benefits obtained as a results of their tortious conduct;

I.      Awarding WestRock compensatory, special, consequential, exemplary, treble, and punitive damages in an amount to be determined but no less than the amount of WestRock's actual loss and the amount of Dillon's and CDS's  unjust enrichment;

J.      Awarding WestRock its attorneys' fees, costs, and other expenses incurred in this Action and in otherwise enforcing its rights and addressing misconduct by Dillon and CDS;

K.      Awarding WestRock interest; and

L.      Ordering such other and further relief as the Court deems just and proper.

8349333 v1

Respectfully submitted,

Dated: October 12, 2021

**SILLS CUMMIS & GROSS P.C.**

/s/ *Patricia M. Prezioso*
Patricia M. Prezioso, Esq. (Pro Hac Vice –
   Admission Pending)
One Riverfront Plaza
Newark, New Jersey 07102
Tel. (973) 643-7000
pprezioso@sillscummis.com


**JOHNSON & BELL, LTD.**

Genevieve M. LeFevour (Local Counsel)
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
Tel. (312) 372-0770
Lefevourg@jbltd.com
#6290033

*Attorneys for Plaintiffs WestRock Company
and Victory Packaging, LP*