## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WESTROCK COMPANY and<br>VICTORY PACKAGING, LP,<br><br>             Plaintiffs,<br><br>             v.<br><br>THOMAS DILLON and CDS MOVING<br>EQUIPMENT, INC.,<br><br>             Defendants. | Case No. 21-CV-05388<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

This case centers on a former Westrock Company ("Westrock") employee named Thomas Dillon ("Dillon") who left Westrock in April 2021 to work for a competitor, CDS Moving Equipment, Inc. ("CDS"). According to Plaintiffs, before Defendant Dillon left Westrock, he misappropriated trade secrets and proprietary information and improperly solicited a customer to CDS. Plaintiffs also allege that Defendants continue to use these trade secrets to unfairly compete and take their customers. Plaintiffs bring claims against Dillon and CDS for violation of the Defend Trade Secrets Act and Illinois Trade Secrets Act, and tortious interference with contracts and business relations; and against Dillon for breach of contract and breach of fiduciary duty. Plaintiffs also filed a Motion for Preliminary Injunction, [4], and Defendants moved to dismiss Plaintiffs' claims, [65]. For the reasons set forth below, the Court grants in part and denies in part both motions, [4], [65].

## I. Background

Plaintiff WestRock Company ("WestRock") is a vertically integrated paper and packaging product manufacturer and supplier. WestRock sells packaging products to many types of customers, including moving companies. [1] ¶¶ 13, 14, 16. In 2018, it acquired Plaintiff Victory Packaging, LP ("Victory").[1] *Id.* ¶ 14. Defendant CDS competes with WestRock to supply moving companies with moving equipment and packaging material. *Id.* ¶¶ 3, 29–30. The current president of CDS, Richard Bruns, was formerly a WestRock executive, but he left WestRock on "unhappy" terms in November 2019. [1] ¶¶ 31, 34; *see also* [24-1] ¶ 6. According to WestRock, it terminated Bruns for stealing hundreds of thousands of dollars. [98].

### A. Thomas Dillon's Tenure at WestRock

Until April 2021, Defendant Dillon worked for Westrock selling paper products throughout Illinois, in the Madison Wisconsin area, and in parts of Iowa. *Id.* ¶¶ 36–37, 39. Dillon first worked for Victory from 2011 to 2014 and again beginning in late 2017; he became a Westrock employee when Westrock acquired Victory. *Id.* ¶¶ 35–36.

In early 2019, Dillon reviewed a WestRock training module that included a policy entitled "Employee Agreement Regarding Confidentiality, Inventions, Works, Computer Software, and Permissions (Revised version – Feb. 2019)" ("Confidentiality Agreement"). [28] ¶¶ 8–11. Among other things, the Confidentiality Agreement

---

[1] WestRock and Victory are both plaintiffs in this action. For ease of reference, this Opinion refers to them collectively as "WestRock" or "Plaintiffs".

states that, as a condition of employment and for five (5) years after employment ends, an employee shall:

> [Not] directly or indirectly, divulge or make use of any Confidential Information of WestRock other than in performance of [employment] duties for WestRock or for the benefit of Westrock.

> Make all reasonable efforts to protect and maintain the confidentiality of the Confidential Information of Westrock and follow all policies and procedures established by WestRock with respect to its Confidential Information . . .

> Upon cessation of [ ] employment for any reason, [ ] (a) promptly deliver to WestRock and not keep, copy, store, retain  or take for any purpose any information provided to [the employee or which the employee] developed or collected in the course and scope of [the employee's] employment, whether or not [the employee] consider[s] such information to be Confidential Information; (b) certify in writing that [the employee] ha[s] complied with this provision if so requested by WestRock; (c) promptly identify and disclose to WestRock all passwords [the employee] ha[s] been given or which [the employee] created to access WestRock systems, and (d) attend an exit interview if so requested by WestRock where such matters may be discussed.

[1.1]  §§ 2.2, 2.3.   The Confidentiality Agreement broadly defines "Confidential Information" as:

> all valuable and/or proprietary information (in oral, written, electronic or other forms) belonging to or pertaining to WestRock or provided to WestRock by third parties, which WestRock treats as confidential and which would be useful to competitors of WestRock or otherwise damaging to WestRock if disclosed.

*Id.* § 2.1.  It also outlines a nonexclusive list of Confidential Information that includes: (1) "information regarding customers or vendors of WestRock and the terms of those relationships"; (2) "financial reports and analyses"; (3) "research and development"; and (4) "information provided to WestRock by third parties under a duty to maintain the confidentiality of such information." *Id.*

After Dillon electronically viewed the training module, he electronically acknowledged the following certification: "I certify that I have read and understand the WestRock Intellectual Property and Confidentiality Agreement Policy." [1-1] at 6; [28-4].

Around the same time, he also reviewed WestRock's "Confidential Information and Trade Secrets" Policy and "Acceptable Use" Policy. [28] ¶11; [28-4] at 4. The Confidential Information and Trade Secrets Policy defines "Confidential Information" to include "technical, financial, operational, and strategic information" such as "business plans, customer and supplier lists, contracts, and financial data" and "transactions with customers, marketing plans, supplier arrangements, and pricing information" among other things. [28-3] at 2. It also indicates that Confidential Information should be marked as "Confidential – For WestRock Internal Use" but that even unmarked information may still be Confidential Information. *Id*. Finally, it defines "Trade Secrets" as a subset of Confidential Information that has economic value because of its secrecy that has been protected by reasonable efforts. *Id*. at 3.

The Acceptable Use Policy prohibits "saving or forwarding trade secrets, intellectual property, or propriety or confidential information about or belonging to WestRock, WestRock's customers, or WestRock's employees, vendors or business partners to a personal device or personal email account". [28-2] at 4.

## B.    Dillon's Resignation from WestRock

On April 21, 2021, Dillon resigned from WestRock. Dillon's boss, Sean Huggins, testified that Dillon said he decided to leave the packaging industry and was taking a job with a software company. [5-1] ¶ 6; [118] at 25:7–19. Huggins

4

testified that, because Dillon said he was leaving the industry, Huggins allowed him to stay for two weeks to transition his clients and did not revoke his WestRock systems access. [5-1] ¶¶ 6, 7, 45; [118] at 26:5–10. Dillon did not stay for the full two-week period, however; instead, he abruptly left on April 27, 2021. [5-1] ¶ 8. Before leaving, Dillon returned his company-issued laptop and cell phone. *Id.*

The day after Dillon left, Huggins—unable to find a list of Dillon's customer contacts—asked another sales representative, Aaron Yates, to call Dillon for his customer list. *Id.* ¶ 8 n.2; [19]. That same day, Dillon, using his personal email, sent Yates an excel file titled "Mover List 12-21-17", which listed customer contact information for 209 moving companies in the Chicago area. Dillon also emailed Yates a list of 83 customer email addresses. [19] ¶ 5. A few days later, Dillon—on his own accord—forwarded to Yates an email from a customer who had contacted Dillon via his personal email to request a supply of moving boxes. [24-2] ¶ 41. Finally, on June 11, 2021, at Huggins' request, Yates also contacted Dillon for the passcode to Dillon's work-issued cell phone. [19] ¶¶ 6–7.

At some point, Huggins and WestRock discovered that Dillon had not left the packaging industry as he claimed.[2] [5-1] ¶ 9. Instead, he left to work for CDS. *Id.* WestRock believes that CDS's president, Bruns, solicited Dillon to leave WestRock for CDS. [1] ¶ 56.

---

[2] WestRock did not specify when it first learned that Dillon was working at CDS. [5-1] ¶ 9. In addition, Dillon's affidavit did not address whether he lied to Huggins about going to a software company. At the hearing on December 10, 2021, Dillon's attorney acknowledged that Dillon was "vague" with Huggins about his new job.

In addition, between May and June 2021, WestRock determined that Dillon may have misappropriated WestRock's confidential information. First, on May 5, 2021, Huggins accessed Dillon's WestRock email account to monitor for customer sales requests. [30] ¶ 38. He discovered that Dillon had sent to his personal email many WestRock files, which the Court discusses below. *Id.* Huggins did not contact Dillon to instruct him to delete them,[3] but at some point he contacted internal legal about it. [118] at 71:10–16. Between June and July 2021, WestRock engaged a forensic expert to review Dillon's company-issued devices. [5-23] ¶ 9. Its expert reported that Dillon had also connected a flash drive and an iphone. *Id.* ¶¶ 19–25; [29] ¶¶ 15–16. *See also* discussion at § II.A.1, *infra.*

Further, WestRock began noticing a reduction in sales volume. In mid-June 2021, a WestRock driver learned that Dillon had solicited one of WestRock's customers ("Customer A") to CDS while he still worked for WestRock. [5-14] ¶¶ 46. WestRock also lost sales from a customer's ("Customer B's") San Antonio, Texas location (which is outside Dillon's WestRock sales territory but where Rick Bruns is located). [75] ¶ 12. Two other WestRock salesmen also learned that CDS was supplying the Chicago locations of other WestRock's customers (Customers C, D), and possibly Customer B. *See* [5-15] ¶¶ 2–5; [5-16] ¶¶ 3–6.

With respect to Customer A, Dillon told WestRock on March 15, 2021 (shortly before he quit) that Customer A decided to purchase its boxes from another

---

[3] Huggins testified that he believes Yates told Dillon to return the files. [118] at 71:6–20. Yates' affidavit, however. does not state that he did so. [19]. Therefore, the Court does not credit Huggins belief at this stage.

competitor and instructed WestRock to return to Customer A its box logo printing plates. [5-13] On March 19, 2021, Dillon also asked the WestRock warehouse to make boxes for Customer A at Dillon's own expense, claiming that it was for a charity event with Customer A. [5-18]. Based on what WestRock learned in June 2021 and from emails Dillon forwarded to his personal email before he left, WestRock now believes that Dillon lied and instead took these actions to move Customer A to CDS. [5-1] ¶¶ 56–63.

WestRock insists that the files Dillon emailed to his personal email (and possibly downloaded onto a flash drive) in the months before he quit contained trade secrets, and further provide the "keys to WestRock's kingdom." [63-1] at 7. While the Complaint relies heavily on vague and conclusory statements about the contents and confidential nature of these files, [1] ¶ 58; *see also id*. ¶¶ 48, 51, 57, WestRock does elaborate upon a subset of these materials, [1] ¶¶ 58–59, 72–73, 81; [4]; [5-1]; [30]; [75], which the Court categorizes as follows:

- **Category 1—Customer Contact Information**
  - January 15, 2021 email exchange with Dillon and a new customer about filling out a new customer order form [82];
  - February 1, 2021 email attaching spreadsheets with contact information for hundreds of moving company customers. [38], [39], [40].

- **Category 2—Customer Pricing Information**
  - February 11, 2021, and March 3, 2021 emails, each with an attached individual customer price list. [76], [77], [79], [88];
  - January 27, 2021 email and attachments regarding updated customer pricing list and planned incentive pricing. [86];
  - April 21, 2021 Email attaching a new national contract with Customer B, along with a price list, and warehouse stock totals. [51].

- **Category 3—Sales, Profits and Stock Information**

  o March 31, 2021 Email attaching two excel files with customer sales information for hundreds of WestRock customers, [42];

  o February 12, 2021, March 15, 2021, March 23, 2021 and April 8, 2021 emails attaching updated stock list for 89 WestRock products, [43], [78], [80], [81].

- **Category 4—Customer Order Logs**

  o April 21, 2021 and April 27, 2021 emails with links to next-day delivery logs for Dillon's customers. [30-1], [31], [75-4].

- **Category 5—Sales Strategy Materials**

  o February 1, 2021 email attaching "TD Chicago Pipeline 070620" spreadsheet tracking Dillon's efforts to secure customer business, [87];

  o April 6, 2021 email exchange between Dillon and other sales representatives about contacting a potential new customer [83].

- **Category 6—Files relating to Customer A:**

  o February 22, 2021 email attached a "print card" layout for Customer A's box logo design, [44];

  o March 2021 emails to Customer A with order forms, current price list for 68 products and a consignment count report, [41], [45];

  o March 2021 emails attaching Customer A invoices from February and March 2021. [46], [47].

WestRock claims that Dillon misappropriated these files in violation of the Defend Trade Secrets Act ("DTSA") and Illinois Trade Secrets Act ("ITSA"), breached the parties' Confidentiality Agreement and violated WestRock's general "Acceptable Use" and "Confidential Information and Trade Secrets" policies.

WestRock also maintains that CDS knows Dillon misappropriated this information because CDS's president, Rick Brun, worked at WestRock and knows the terms of WestRock's Confidentiality Agreement. [5] at 12–13; [75] ¶¶ 13–15. Based on Brun's purported knowledge, WestRock alleges that CDS improperly induced

Dillon to violate the Confidentiality Agreement and misappropriate WestRock's trade secrets. [5] at 12–13. WestRock insists that Dillon and CDS used these trade secrets to steal Customers A, B, C, and D and that they will continue to use the files to unfairly compete with WestRock. *Id.* 13–14. WestRock now seeks an injunction to enjoin Defendants from accessing, using, or disclosing all of the WestRock files Dillon took; require they return the files and participate in data remediation and some expedited discovery. [4].[4]

### C.  Dillon and CDS's Response to WestRock's Allegations

Dillon does not dispute that he emailed to his personal account various WestRock files and occasionally used a flash drive. In fact, Dillon submitted a forensic expert's report confirming that he sent hundreds of emails from his WestRock account to his personal email during his tenure and at least 54 WestRock emails in the months before he quit in April 2021. [24-3]. Instead, Dillon argues that he did not *misappropriate* any trade secrets because he routinely used his personal email and flash drives when performing his job. [24-2]. ¶¶ 32–36. According to Dillon's forensic expert, between 2011 and 2021 forty-three Victory email addresses sent 592 emails to Dillon's personal email account. [24-3] at 21–22. Focusing on recent years,

---

[4] WestRock's motion also sought to enjoin Dillon (and CDS) from soliciting or even contacting the hundreds of customers whose names appear on the protected files. [4] ¶ 2. Such a broad injunction would essentially impose a non-compete against Dillon and CDS, and block them from a large segment of the industry for the foreseeable future. But WestRock did not have a non-compete with Dillon and such an injunction would "derive the benefits of a restrictive covenant which [WestRock] never obtained from [Dillon.]" *The Colson Co. v. Wittel*, 568 N.E.2d 1082, 1088 (Ill. App. Ct. 1991). In fact, it would likely do more than a non-compete could. Equity generally does not support such an injunction. *See id.* (declining to enjoin former employee from soliciting business away from former employer where the employee had not signed a non-compete). Prior to the evidentiary hearing, however, WestRock abandoned this request and submitted an updated proposed preliminary injunction order that no longer includes a broad non-compete provision.

most of the emails came from a few WestRock employees and a "Customer Service – Chicago" email account. *Id.* Dillon also claims that he did not think WestRock had a policy forbidding him from using his personal email and that, when he resigned, WestRock did not ask him to delete WestRock files. [24-2] ¶¶ 32–41. Dillon also maintains that WestRock knew he retained some files after he resigned because he emailed one of the complained-of files (a customer list) to Aaron Yates after he quit. *Id.* ¶¶ 39–41.

Further, Dillon disputes that he signed the Confidentiality Agreement. *Id.* ¶¶ 30–31. Although he recalls briefly viewing a "training module" about confidential information in February 2019, he claims that he did not realize that, by certifying he reviewed the "training module", he had "supposedly signed a confidentiality agreement with WestRock." *Id.* ¶ 31.

Regardless, Dillon also contends that none of the files or information at issue constitute trade secrets or confidential information. *Id.* ¶¶ 42–45. Both he and his new boss, Rick Bruns, insist that customer pricing, sales history, and customer contact information are not confidential in the packaging product industry; and that stock listing information fluctuates so frequently that it is stale and has no value to competitors. *Id.*; [24-1] ¶¶ 27–30; [95]; [96].

Finally, Dillon and CDS admit that CDS provides packaging supplies to Customers A, B, C and D, but they deny using any of WestRock's information (whether confidential or not) to win those accounts. [24-1] ¶ 25. Bruns states that CDS had a pre-existing relationship with these customers and sold them products in

the past. *Id.* ¶ 22. With respect to Customer A, C, and D, Dillon maintains that they followed him to CDS because they share a longstanding close business and personal relationship. [24-2] ¶¶ 19–26. Dillon does not address, however, whether he solicited Customer A to CDS while still employed by WestRock. With respect to Customer B, CDS's new business derives from the customer's San Antonio, Texas location, which is outside Dillon's geographic market. [118] at 58:8–19.

## II. Motion for Preliminary Injunction

A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). This is because it is "an exercise of a very far-reaching power, never to be indulged except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). A movant "must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; [and] that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

The Seventh Circuit recently clarified the proper standard for evaluating a "likelihood of success" on the merits. For many years, courts in this Circuit inquired whether the moving party demonstrated a "better than negligible" chance of prevailing on its claim. *See, e.g., D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016) ("In framing the probability of success necessary for a grant of injunctive relief, we have said repeatedly that the plaintiff's chances of prevailing need only be better than negligible."); *Omega Satellite Prod. Co. v. City of Indianapolis*, 694 F.2d 119 (7th Cir. 1982) (uttering the "better than negligible" standard for the first time); *see also* [4] at

6 ("Plaintiffs need only demonstrate a better than negligible change of succeeding." (*citing Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). The tides changed, however, following the Supreme Court's twin decisions in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) and *Nken v. Holder*, 556 U.S. 418 (2009), where the Court demanded a higher showing. The Seventh Circuit thus "retired" this "better than negligible" language and adopted a "strong" showing in its place. *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020) ("We note this to remind both the district courts and ourselves that the 'better than negligible' standard was retired by the Supreme Court."); *Mays v. Dart*, 974 F.3d 810, 821 (7th Cir. 2020) (explaining that the "better than negligible" standard "is not the proper standard to apply when evaluating the likelihood of success on the merits in a preliminary injunction motion."); [21] at 8. The revision, however, is only a change in degree, not kind: a plaintiff must still only demonstrate that the claim has "some chance" of success; "better than negligible" will not do.

If the movant fails to make this three-part prefatory proffer, the court must deny the injunction. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

If, on the other hand, a plaintiff satisfies each part of the three-prong proffer, then the trial court proceeds to "weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction," and must consider "the public interest." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). At this stage, this "Circuit employs a sliding scale approach

for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor.'" *Id.* (citations omitted).

### A.      Likelihood of Success on the Merits

#### 1.      ITSA and DTSA Trade Secret Claims (Counts I & II)

To establish violation of the ITSA or DTSA, WestRock must prove that "(1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use, and (3) the misappropriation damaged the trade secret's owner." *Moss Holdings Co. v. Fuller*, 2020 WL 1081730, at *5 (N.D. Ill. Mar. 6, 2020) (*quoting Aon Risk Servcs. Co. v. Alliant Ins. Servs.*, 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019)). The ITSA and DTSA mirror one another, so courts consider "the likelihood of success of the two claims together." *Aon Risk Servcs.*, 415 F. Supp. 3d at 848.

As a threshold point, for misappropriation claims, "the plaintiff must define the allegedly misappropriated secrets with sufficient specificity." *Next Payment Solus., Inc. v. CLEAResult Consulting, Inc.*, No. 17 C 8829, 2019 WL 955354, at *22 (N.D. Ill. Feb. 27, 2019). This is so because, "without enough specificity of what information constitutes the claimed trade secret, the Court cannot properly analyze the elements of a trade secret claim." *Id.*; *cf. IDX Sys. Corp. v Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition").

Generally, WestRock complains that Dillon misappropriated all the files he emailed to himself (or potentially downloaded onto external drives) in the "months

before his leaving to work for CDS", [1] ¶¶ 57, 73, 82, 87; the evidence shows that Dillon emailed to his personal email at least 54 WestRock emails between January 1 and the end of April 2021, [24-3] ¶ 20. Yet, WestRock only offers specific evidence about a subset of those files (Categories 1–6 outlined above). At this stage, the Court can only "properly analyze" this subset of emails. *See Next Payment*, 2019 WL 955354, at *22.

At the evidentiary hearing, the parties devoted considerable time to Dillon's alleged copying of files onto an external drive before leaving. Defendants, through their forensic expert, attacked some of the assertions made by WestRock's forensic expert, Mr. Lucich. [94]; [118] at 100:8-108:21. Even if the Court accepts Mr. Lucich's opinions, WestRock has failed to provide sufficient information to evaluate its trade secret claims regarding the external drives. Mr. Lucich opined that Dillon connected a flash drive and iPhone to his work computer the month he quit, [5-23], and may have accessed or downloaded some files, *id.* ¶ 30, but WestRock is not able to identify which files, if any, Dillon downloaded to these devices. Mr. Lucich, however, opines that he found five files on Dillon's work computer that Dillon may have copied, *id.* ¶ 32; yet WestRock only asserts that these files include the names of Customers A and B. *Id.* ¶ 34. That is not the same as explaining how or why the files constitute trade secrets. Similarly, Mr. Lucich identified a few folder and file names on the flash drive whose names suggest that they may contain WestRock information. *Id.* ¶¶ 40, 42. Again, merely pointing to folders that might contain WestRock's information does not provide enough information to justify trade secret protection. Overall, at this stage,

WestRock has not provided sufficient information about what files, if any, Dillon copied onto the flash drives to evaluate whether the files constitute WestRock's trade secrets. Because of this, WestRock has failed to show likelihood of success on the misappropriation claims premised on Dillon's purported external drive usage.

### a) Whether the Alleged Information in Categories 1–6 Constitute Trade Secrets.

For information to constitute a trade secret, it must have been "sufficiently secret to impart economic value because of its relative secrecy" and the party claiming protection must have made "reasonable efforts to maintain the secrecy of the information." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003); *see also* 18 U.S.C. § 1893(3); 765 ILCS § 1065/2(d)(2).

Before the Court examines the six categories of emailed files, the Court addresses an overarching issue regarding the "reasonable efforts to maintain secrecy" element. To date, WestRock has not marshalled convincing evidence about how it protects the files at issue. It points to general company policies regarding confidential information, but the record at this stage calls into question whether WestRock adequately enforced these policies. For example, its Confidential Information and Trade Secrets policy instructs employees to mark confidential files as "Confidential – For WestRock Internal Use." [28-3]. Not a single file at issue bears such a mark. Further, its Acceptable Use Policy prohibits employees from conducting business via personal email. [28-2]. Yet, the record shows that Dillon routinely used his personal email to conduct business and other WestRock employees corresponded with him via his personal email. [24-3]. Given that Dillon failed to follow the policy openly for a

substantial period of time without consequence, it is unlikely that WestRock adequately trained its employees on its Acceptable Use Policy or took reasonable efforts to enforce it. In other words, the mere existence of a written policy, standing alone, does not sufficiently demonstrate active efforts to maintain secrecy.

In addition, the Confidentiality Agreement at issue required Dillon to return or delete confidential files upon his departure and further to certify his compliance in writing. [1-1] § 2.3. Yet, WestRock neither asked him to delete anything nor asked for written certification.[5] This, again, calls into question whether WestRock took reasonable steps to protect its confidential information or ensure employees followed company policies. *See CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 885 (N.D. Ill. 2009) (holding that a company's "failure to *ensure* that [defendant]'s laptop was stripped of [allegedly protected information] when she left to company goes to show that it did not treat such Information as confidential or a trade secret." (emphasis in original)).

Further, WestRock generally does not explain where it stores the files at issue, whether it applies special password protection to them, or whether and how it restricts access to them. As the Court will discuss in more detail below, some of these files appear to relate to customers that Dillon did not service. This begs the question:

---

[5] Huggins learned in May that Dillon had emailed WestRock files to his personal email, yet WestRock did not file suit for more than five months. At the injunction hearing and in their motion to dismiss, [66] at 10–11, Defendants insist this demonstrates as a matter of law that WestRock did not reasonably protect its files. But the evidence shows that WestRock served Dillon with a cease-and-desist letter on June 29, 2021 and served CDS with a preservation notice on July 29, 2021. [6-1]; [6-2]. Thus, WestRock took some legal action within a few months of learning that Dillon had emailed files, had joined CDS and had solicited away some customers. Based on the record, the Court cannot say this constitutes a *per se* unreasonable delay that destroys trade secret protection.

how and why did Dillon have access to them? *Cf. Servic Ctrs. Of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1136 (Ill. App. Ct. 1989) (finding trade secret protection was reasonable because information was only available to those who needed to know it); *Elmer Miller, Inc. v. Landis*, 625 N..2d 338, 343 (Ill. App. Ct. 1993) (same).

Of course, the law "requires only reasonable measures, not perfection" to maintain secrecy. *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (N.D. Ill. 2004). Because WestRock presented general policies aimed at safeguarding its confidential information, the record at this stage does not establish that WestRock categorically failed to take reasonable efforts, but this evidentiary weakness undermines WestRock's likelihood of future success in proving that these files constitute trade secrets. With that broad point, the Court now turns to the six categories of emailed files.

### i. Category 1—Customer Contact Information.

A few months before he quit, Dillon emailed to himself numerous files with addresses and phone numbers for hundreds of WestRock's moving company customers both inside and outside Dillon's sales territory. [5-1] ¶¶ 54a–c, [38], [39], [40]. Some of the lists also included WestRock's customer number; how many payments each customer made to WestRock; how each one pays (*e.g.* "Net 30 days"; "Prepay by Credit Card"); and the customer's "total spend." *Id.* Among the files is the contact list that Dillon emailed to Yates after he quit. Dillon also forwarded to

himself a customer email exchange attaching a "new customer form" with the customer's shipping and contact information.[6] [86].

WestRock insists that these customer lists constitute trade secrets. It acknowledges that moving company contact information is publicly available but argues that its compilation of that information renders them trade secrets. [63-1] at 6–7. Defendants counter that customer contract information is publicly available and well-known in the industry and thus cannot constitute a trade secret. [24] at 7–8. Similarly, they argue that customers freely share with potential suppliers the amount they spend on packaging supplies and methods of payment, so this information does not warrant trade secrecy protection. *Id.*

In some cases, customer lists constitute a trade secret because customers and their identities are not publicly known. *See Mickey's Linen v. Fischer*, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017) (collecting cases). If information exists in the public domain, compilations of such information may be protectable if it "would require substantial time, effort, and expense to recreate the compilation." *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 897 (N.D. Ill. 2019) (citing *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992)).

Here, WestRock asserts that its "customer lists [] cannot be easily recreated," [5] at 11, but fails to offer evidence to support this contention. Rather, in many respects, these lists appear like a yellow-page listing of moving companies. Further,

---

[6] WestRock claims that this customer exchange and new order form reflects "customer requests and purchasing needs, which would be valuable to a competitor." [75] ¶ 4. The Court finds no such information on this form. Other than shipping addresses and contact information, the new order form only specifies that the company has a loading dock but no forklift and a lift gate is required. [86].

while the lists include a few other data points besides addresses and phone numbers, WestRock fails to explain how it would take substantial time or effort to compile such information or how such high-level information would "impart economic value because of its relative secrecy." *Learning Curve Toys*, 342 F.3d at 722. Thus, at this stage, the record does not indicate that customer contact lists in this industry constitute a trade secret.

Further, as discussed above, WestRock does not demonstrate whether or how it reasonably protected these lists. Huggins states that his sales representatives update contact information in WestRock's SalesForce program, but they also maintain their own contact lists "for the WestRock customers they service." [5-1] ¶ 47. If true, this may explain why Dillon had access to customer lists for his customers (perhaps he maintained these lists). But some of the lists include customers outside of Dillon's geographic area and that he did not service. This again begs the question: how did Dillon have access to these lists?

Huggins' own conduct also calls into question whether these constitute trade secrets. As discussed above, after Dillon resigned, Huggins asked Yates to contact Dillon for his customer contact list. Dillon sent it to Yates and Huggins reviewed the list, [5-1] ¶ 48. Thus, Huggins knew Dillon still had access to it after leaving WestRock's employ. Yet, Huggins did not instruct Dillon to delete the file or enquire as to his reasons for keeping it. So, either Huggins did not consider the information confidential (or else he would not expect Dillon to still have the lists) or WestRock did not make reasonable efforts to protect the information (because Huggins did not tell

Dillon to delete the files). Either way, at this stage, WestRock has failed to demonstrate likelihood of success on the merits with respect to the customer lists. *See, e.g., Fleetwood Packaging v. Hein*, No. 14-C-9670, 2014 WL 7146439, at *4 (N.D. Ill. Dec. 15, 2014) ("Customer lists can constitute trade secrets only where reasonable steps to preserve secrecy have been taken, such as encrypting the lists or requiring review in only restricted-access rooms.")

### ii. Category 2—Customer Pricing Information.

WestRock also complains that Dillon forwarded to his email customer pricing information, including individual customer price lists and a national contract with Customer B. *See* [41], [51], [76], [77], [79], [88]. WestRock insists that customer-specific pricing information constitutes a trade secret and provides the key to WestRock's pricing strategies. [5] at 10–11; [63-1] at 7–8. According to WestRock, Dillon (and CDS) can use this information to unfairly undercut WestRock's prices and strategically poach its customers. [63-1] at 7–8.

In response, Defendants argue that packaging suppliers do not consider pricing information confidential. Bruns and Dillon both submitted affidavits claiming that prices are benchmarked from publicly known indices, suppliers do not restrict customers from sharing product prices, and customers frequently share supplier product pricing during price negotiations. [24-1] ¶¶ 9–21; [24-2] ¶¶ 4–18.

Some of Plaintiffs' own evidence supports Defendants' position. First, WestRock's Code of Conduct contemplates that this information exists in the market-place and customers may share it. [28-1] at 25 (instructing that "[c]ompetitive pricing information may be gathered from the *market-place (public sources, vendors,*

*customers).*" (emphasis supplied)).   While Huggins testified that he instructs his salespeople not to ask customers about competitors' pricing, he acknowledged that WestRock's policies are mostly driven by antitrust concerns.   [118] at 95:24–96:8. Antitrust concerns (about bid rigging, price fixing, collusion and the like) stand apart from trade secret concerns.

Second, Huggins acknowledged that customers frequently share competitors' prices during price negotiations.  *Id*.  Dillon also submitted examples of it, [96], Grp. Ex. A; and in fact, WestRock did, too.  That is, WestRock submitted a salesperson's affidavit that attached photos he took of customer invoices from CDS to Customers C and D.  [5-16]; [5-21].  WestRock submitted this evidence to prove that CDS services Customer C and D, but it also confirms that customers share competitor's invoices. Surely, WestRock does not believe that its salesperson potentially misappropriated CDS's trade secrets when he photographed these invoices.

Third, WestRock does not require its customers to sign confidentiality agreements about its product pricing even though its Code of Conduct instructs employees to do so before "sharing WestRock's next great idea or other proprietary information."  [28-1] at 21.  At the hearing, WestRock devoted considerable time on Customer B's national contract and how it may be highly valuable to competitors. [118] at 21:9–35:12, 51:21–77:5.   But WestRock did not mark this contract confidential; nor did it restrict Customer B from sharing it.  *Id*. at 76:23–77:5.  In fact, Huggins testified that WestRock does not require its moving and storage customers to sign confidentiality provisions because they are "stock offering[s]."  *Id*. at 95:15–

18. In contrast, it requires its industrial customers to sign confidentiality agreements because "[Westrock] do[es] a lot of engineering and intellectual work to do the designs." *Id.* This distinction implies that either WestRock does not believe that its moving and storage pricing warrants trade secret protection, or else it failed to consistently follow its own policies to protect its trade secrets.[7]

WestRock counters that information does not lose trade secret protection merely because a customer shares it. [63-1] at 8. This is generally true in Illinois, where courts reject the notion that "the ability of a customers to share information destroys the confidentiality of that information." *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1132 (N.D. Ill. 2019) (quoting *SKF USA, inc. v. Bjerkness*, 636 F. Supp. 2d 696, 713 (N.D. Ill. 2009)). Nonetheless, the record at this stage does not indicate that anyone, including WestRock, treated individual pricing terms as a trade secret. WestRock has not shown likelihood of success in proving that customer pricing, including price sheets and Customer B's national contract constitute trade secrets.

### iii. Category 3—Sales, Profits and Product Stock Information

WestRock also identifies files Dillon forwarded to himself, which detail customer sales histories, WestRock's profit margins, and product stock information. One spreadsheet details individual monthly sales and gross profits for hundreds of

---

[7] Huggins sent the email that Dillon forwarded to himself with Customer B's contract. Huggins told the email recipients that they could share the pricing with their Customer B contacts but, "I don't want the attached spreadsheet sent to them as it can be manipulated so please wait for the PDF version." [51]. In his affidavit, Huggins claims that this language indicates "WestRock aims to protect the information from being manipulated or shared." [30] ¶ 23. The Court agrees with Huggins as to manipulation. But this language does not demonstrate that WestRock did not want the information shared.

WestRock's customers from 2020 to 2021. *See* [42]. Another provides month-to-date sales comparisons between 2020 and 2021 for thousands of customer locations. *See* [54]. Still other spreadsheets detail WestRock's current stock listings for dozens of products and WestRock's wholesale costs and potential profit margins. *See* [43].

Bruns and Dillon contest the confidentiality of this information on numerous grounds. First, with respect to sales histories and profit margin information, Bruns and Dillon again argue that customers readily share prices and note that the industry generally knows the price of wholesale goods. Thus, according to them, one can easily recreate these spreadsheets and calculate WestRock's gross profit margins based on the publicly known wholesale price and the easily obtainable price that the supplier charges each customer. [24-1] ¶¶ 13–17, 27–28.

Even if Defendants could theoretically do this, they significantly understate the complexity of the task. Hundreds of WestRock customers would need to agree to share their WestRock purchase histories for the past year, broken down by month, location and individual product. Then, Defendants would need to determine the monthly wholesale costs of each product over the past year. This would surely be extraordinarily difficult and time consuming. And this information surely has value to a competitor. A competitor could identify the largest, most lucrative accounts to target. And given the breadth and depth of information, the information may offer insight into WestRock's pricing and bidding strategies.

Second, Defendants argue that the information has no value to CDS because "raw materials, inputs and finished product prices have been under extreme

volatility" due to the Covid-19 pandemic and the price information in these spreadsheets are now stale. [24-1] ¶ 15. Yet, that does not address whether the information had value *at the time Dillon emailed it to himself*. Further, a competitor could still use the information to target WestRock's highly lucrative customers or identify ways to undercut WestRock's prices. These spreadsheets surely have enduring value to WestRock's competitors even if some data is stale. Even WestRock's stock lists—which contain far less data than the sales history spreadsheets but still show gross profit margins—may help a competitor identify specific products on which to undercut WestRock's prices. Finally, even if the spreadsheets' individual or collective value diminish over time, that fact goes to irreparable or future harm, not whether WestRock's trade secret claims have merit.

That still leaves the second element necessary to show a "trade secret": did WestRock make "reasonable efforts to maintain the secrecy of the information"? *Abrasic 90*, 364 F. Supp. 3d at 896–97. Again, WestRock fails to offer evidence about how it protected these files, specifically. But at a preliminary injunction phase, a party must only make a sufficiently "strong" showing that it will succeed on the merits. *See Ill. Republican Party*, 973 F.3d at 762–63. Notwithstanding some evidentiary weaknesses in the record, WestRock has made such a showing with respect to the files in Category 3.

### iv. Category 4–Customer Order Logs.

The day after Dillon left WestRock, WestRock's system sent to Dillon's work email two links to customer order logs for Dillon's customers. The following morning, these emails were forwarded to Dillon's personal email. [24-3] at 58; [30] ¶ 13; [30-1];

[31]. WestRock believes Dillon remotely logged into his WestRock email after he quit and forwarded the links to his personal email. Dillon's affidavit remains silent on this allegation. [26-2]. The logs at issue detail daily customer orders for April 27, 2021 and April 28, 2021 for Dillon's customers (about a dozen customers in all). [31]. The reports list: (1) customer name and ID; (2) order date and number; (3) item and quantity ordered; (4) item "net price", "extended price", "extended cost"[8]; (5) WestRock's gross profit percentage for the order; and (6) promised delivery and dispatch date. *Id*.

According to Huggins, WestRock's system automatically sends these reports to sales staff to show "pending orders for the day, which are scheduled for delivery the next day." [30] ¶ 15. Huggins claims that these reports constitute trade secrets because, with them, "Defendants have access to WestRock's entire pricing scheme." [30] ¶ 15.

Huggins' claim overstates the value of the reports. The reports list only a dozen customers and their orders over two days. Even though the reports show the varying prices each customer paid for the same product, WestRock fails to explain how this information shows a pricing scheme for its hundreds of other customers.

Yet, that does not mean they have no value as Defendants argue. While WestRock has not shown that individual product pricing is confidential, these daily order logs contain the same type of sales history and gross profit information

---

[8] The "net price" gives the price per item; the "extended price" gives the total price for quantity the customer ordered; the "extended cost" gives WestRock's wholesale cost; and "gross profit" percentage gives the difference between the extended price and extended cost divided by the extended price. *See* [31].

contained in the sales history and product stock spreadsheets discussed above, albeit a much smaller snapshot.

Defendants also argue that WestRock did not reasonably protect these reports because it did not terminate Dillon's access to WestRock's systems when he quit. Dillon unexpectedly left WestRock on April 27th, midway into his two-weeks' notice period; Huggins requested on April 29 that WestRock terminate Dillon's access; and WestRock terminated it by April 30. [30] ¶ 35. Given Dillon's unexpected departure on April 27, WestRock acted reasonably and quickly. The Court declines to deny WestRock trade secrecy protection when it acted swiftly, albeit not immediately. *See Zeigler Auto Grp. II, Inc. v. Chavez.*, 2020 WL 231087, at *4 (N.D. Ill. Jan. 15, 2020) (this Court finding that a former employer acted reasonably when it terminated employees' access to its systems within days of resignation).

Overall, although WestRock's evidence remains weak in certain areas, it has made a sufficiently "strong" showing that it will succeed on the merits of showing that the order logs constitute trade secrets. *See Pritzker*, 973 F.3d at 762–63.

### v.    Category 5—Sales Strategy Materials

WestRock also complains about two emails that the Court categorizes as "sales strategy materials": (1) a February 1, 2021 email attaching a "TD Chicago Pipeline 070620" spreadsheet, [87]; (2) an early April 2021 internal email exchange between WestRock sales employees about how to get business from a new customer, [83]. The "TD Chicago Pipeline 070620" spreadsheet lists dozens of existing and prospective customers; their annual sales; names of competitors who supply that customer; and

notes on efforts to win new business. [87].  The April 2021 email exchange includes similar information about efforts to win business from one prospective client, [83].

The Court agrees with WestRock that a competitor would find this information valuable and at least some of it (like ongoing sales efforts notes) is not known in the market.  Further, because these relate to Dillon's own sales region, it seems reasonable that he would have access to these materials.  Based on this, WestRock has sufficiently shown that it will succeed on the merits of proving that these documents constitute trade secrets.  *See Pritzker*, 973 F.3d at 762–63.

###                 vi.         Category 6—Files relating to Customer A

Finally, WestRock points to files that Dillon emailed himself about Customer A, including: (1) Customer A delivery receipts and invoices from February and March 2021, [46], [47]; (2) price lists, *id.* [41], [45]; (3) consignment reports, *id.* Exs. [45], [47]; and (4) a "print card" layout for Customer A's box logo design, *id.* [44].

With respect to Customer A's delivery receipts, invoices and price lists, the Court already found that WestRock has not demonstrated a likelihood of success in proving this type of information constitutes trade secrets.  *See supra*, § II.A.1.a.ii.  As to consignment reports, Huggins testified that these detail WestRock's inventory that a customer holds on consignment in its warehouse. [118] at 62:25–63:6.  The reports only list the item, its price and the quantity the customer holds on consignment.  [45]; [47].  This is more akin to customer price sheet than a WestRock stock listing because, unlike the stock listings (*see supra* § II.A.1.a.iii), it does not include wholesale price or margin percentages.  Therefore, the Court finds that the consignment reports do not constitute trade secrets.

That leaves the print card for Customer A's box logo design. [44]. This depicts a scaled-down image of a box with Customer A's logo and other information such as "Fragile" and "This Side Up." The sheet lists "Victory Packaging" as the customer and "Kapstone Container Corporation" as the vendor. *Id.*

WestRock generally claims trade secret protection over this print card but fails to explain if this is *WestRock*'s proprietary information or if it is *Customer A*'s propriety information.[9] Based on the limited record, the Court cannot find likelihood of success on showing this constitutes *WestRock*'s trade secret. Overall, WestRock has not provided enough information to evaluate whether the print card constitutes a trade secret and, if so, if it is WestRock's trade secret. As such, the Court finds WestRock has failed to sufficiently show likelihood of success on the merits.

In sum, at this stage, WestRock has sufficiently demonstrated that the files in Categories 3, 4, and 5 may warrant trade secret protection, but has not met its burden with respect to the files in Categories 1, 2 and 6.

### b)    Misappropriation

Having determined that files in Categories 3, 4 and 5 may constitute trade secrets, the Court now considers whether Defendants "misappropriated" them. "Misappropriation" requires proof that Defendants: (1) acquired the trade secrets knowing or with reason to know that it was acquired by improper means; or (2)

---

[9] WestRock submits other evidence that suggests that *Customer A* may own the rights to this box layout designs. Recall that, in March 2021, Dillon emailed a WestRock employee that Customer A was moving its business to a competitor. [48]. In that email, Dillon instructed the WestRock employee to collect Customer A's box printing plates, which "*are owned by [Customer A]*." *Id* (emphasis supplied). Given this, Customer A may also own the print card. If so, WestRock does not explain how WestRock can claim trade secret protection over it.

disclosed or used the trade secret without WestRock's express or implied consent.  18 U.S.C. § 1839(5)(A)–(B); 765 ILCS 1065/2.

As a preliminary matter, even though Dillon took these files, WestRock also brings misappropriation claims against CDS.  CDS may only be liable for "misappropriation," if it knew or had "reason to know" that the trade secret was acquired by improper means. 765 ILCS 1065/2(b)(1).  "[B]reach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use" qualifies as "improper means." *Id*. at § 2(a).

WestRock argues that CDS's president, Rick Bruns, knew that Dillon misappropriated WestRock's trade secrets because Bruns—as a former WestRock employee—knew that Dillon was subject to a Confidentiality Agreement with WestRock.  [5] at 7, 12–13, 16.  Even if Bruns knew (or thought) Dillon was subject to a Confidentiality Agreement, this does show that Bruns knew Dillon violated the Confidentiality Agreement or took trade secrets.  WestRock offers only speculation that CDS must have known Dillon took files because Dillon must have shared some of the information with CDS.  WestRock also speculates that Bruns may have encouraged or asked him to take some of the files. WestRock also attacks Bruns character based on his alleged misconduct when he was a WestRock employee.  But such speculation and general character attacks do not suffice to establish that Bruns knew (or believed) Dillon misappropriated anything.  As such, based on the record, WestRock has failed to demonstrate likelihood of success on its misappropriation claims against CDS.

That leaves Dillon. WestRock argues that Dillon misappropriated the files by improperly emailing them to his personal email and improperly retaining possession of them after he quit. WestRock also argues Dillon misappropriated the sales report logs (Category 4) when he accessed WestRock's system after he quit and sent the logs to himself. Finally, Westrock argues that, regardless of how Dillon acquired these files, he improperly used them to steal Customer A, B, C and D from WestRock. Alternatively, given the paucity of evidence at this stage regarding whether Dillon used the information to steal WestRock's customers or benefit CDS, WestRock invokes the inevitable disclosure doctrine. [4] at 10 n.5; [63-1] at 13. This doctrine, which the ITSA and DTSA recognize, provides that a court may enjoin *threatened misappropriation* where a defendant's "new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).

### i.      Personal Email Use and Failure to Delete Files

As discussed above, Dillon admits that he emailed to himself the files at issue. But he insists he did so properly to perform his job. [24-2] ¶¶ 32–35. He claims that he had difficulty accessing his Victory accounts when he traveled, so he would email files to his personal email. *Id.*[10] According to Dillon, he did not believe that WestRock prohibited personal email use. And he believed that WestRock knew he periodically used his personal email to conduct business. *Id.* ¶¶ 33, 36, 39.

---

[10] WestRock actually submitted an affidavit from another WestRock employee, Kirk Johansen, which confirmed Dillon's claims. [75-5]. Dillon told Johansen around December 2017 (over three years before he quit) that "his personal email was the only way he could access what he needed. He claimed he had difficulties accessing his Victory account." *Id.* ¶ 4.

The evidence confirms that Dillon periodically emailed WestRock files to his personal computer and that others at WestRock periodically emailed Dillon's personal email account. [24-3]. WestRock downplays this evidence, arguing that these emails made up a "tiny percentage of his total emails;" and that his boss, Huggins, did not know Dillon used his personal email. [63-1] at 10–11. WestRock also argues that its Acceptable Use Policy forbids personal email use and Dillon's misuse does not become proper just because he routinely flouted WestRock's policy. *Id.* 5–6.

Whether Dillon used his personal email frequently or infrequently, the evidence shows that he used it periodically and consistently for many years. [24-3]. In addition, even if his boss did not know he used it, other employees at WestRock knew, including Aaron Yates, who was Dillon's supervisor for a period of time. *Id.*; *see also* [94] at Ex. J; [118] at 63:24–64:2. While WestRock's Acceptable Use Policy bars personal email use, it is not clear whether or how WestRock enforces this policy. It appears Dillon electronically viewed the policy at least once in February 2019, [28] ¶ 11. But WestRock does not explain whether it provided interactive training on the policy; periodically reiterated the policy; monitored employees' compliance with the policy; or otherwise ensured that employees knew and followed it. In addition, other WestRock employees emailed Dillon at his personal email, [24-3], which implies that other employees may not have known the policy or believed WestRock enforced it. At this stage, this casts additional doubt on whether WestRock adequately enforced or explained its Acceptable Use Policy to its employees.

WestRock also cannot prove misappropriation by pointing to Dillon's failure to return or delete the files when he quit. "Failure to return lawfully acquired information does not constitute 'misappropriation' of that information." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020).[11] At this stage, WestRock has not established Dillon misappropriated files merely by emailing them to his personal email or failing to return them after he quit.

### ii.　　　Improper Acquisition or Use

Of course, Dillon still could have misappropriated some of these files if he did not access them for his job duties, but took them for another reason. Or, even if Dillon properly acquired them initially, he could still misappropriate them by later using them at CDS or disclosing them to CDS. Looking at "misappropriation" through these lenses, the evidence shows that WestRock has made a sufficiently "strong" showing that Dillon misappropriated at least some of the files in Categories 3, 4 and 5.

Dillon insists he emailed all these files to himself to perform his job. [24-2]. The Court remains skeptical of Dillon's claim with respect to the purchase history spreadsheets (Category 3) and customer order logs (Category 4). The forensic report shows that Dillon forwarded WestRock's purchase history spreadsheets *for the first* time on March 31, 2021, just a few weeks before he quit. [24-3]. These spreadsheets provide detailed sales histories for hundreds of WestRock customers, many of whom Dillon did not service and that fell outside his geographic area. Dillon fails to explain

---

[11] While the Confidentiality Agreement requires that employees delete or return confidential information when they quit, as discussed in Section II.A.2, *infra*, it remains unclear whether Dillon accepted the Confidentiality Agreement.

why he needed such information at the time he took it. As such, Dillon's claim that he forwarded these files for legitimate reasons lacks credibility. Further, with respect to Customer Order Logs (Category 4), the forensic report shows that someone forwarded links to the logs from Dillon's work email to his personal email *two days after Dillon quit*. Presumably Dillon was that "someone." The Court finds no legitimate basis in the record for Dillon to access his WestRock email after he quit.

With respect to the WestRock's stock listings (which also fall in Category 3), Dillon's assertion appears more credible. Dillon's forensic expert report shows that from at least May 2018 until April 2021 when he left, he routinely forwarded updated stock listings to his personal email. *See* [24-3] at 28–38. Finally, as to the sales strategy materials (Category 5), the Court cannot say based on the limited record whether Dillon improperly accessed the sales strategy materials while employed with WestRock or used or disclosed them since leaving.

### iii.    Threatened Misappropriation

That still leaves *threatened misappropriation* under the inevitable disclosure doctrine. Courts look at three factors for inevitable disclosure: (1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken to prevent use or disclosure of former employer's trade secrets. *See Packaging Corp. of Am.*, 419 F. Supp. 3d at 1070 (citing *PepsiCo*, 1996 WL 3965, at *20). In addition, the former employer must demonstrate an "intent or a high probability" that employee will use trade secrets. *Packaging Corp of Am.*, 419 F. Supp. 3d at 10870 (quoting *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, 734 (N.D. Ill. 2011)).

The first two factors exist here: WestRock and CDS are direct competitors and Dillon's has held similar sales positions at both. As to the third, CDS does not present evidence about what measures, if any, it took. Therefore, at this stage, the Court assumes it took none. Further, Dillon admits that he still has WestRock's files in his possession. As to the probability that he will use them, courts have held that "where evidence exists that the employee copied the employer's confidential information, it leads to the conclusion of inevitable disclosure." *Saban*, 780 F. Supp. 2d at 734 (citing *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001)). As discussed above, the evidence sufficiently indicates that Dillon misappropriated at least some of these files. Therefore, the Court finds this indicates a sufficient probability that he may use the WestRock files that he possesses. Thus, at this stage, WestRock has sufficiently demonstrated likelihood of success on showing threatened misappropriation based on the inevitable disclosure doctrine.

Overall, WestRock has made a sufficiently "strong" showing that Dillon misappropriated or may inevitably disclose the files in Categories 3, 4 and 5.

## 2. Breach of Confidentiality Agreement (Count III)

WestRock also argues it is likely to succeed on its claim that Dillon breached the Confidentiality Agreement. The Confidentiality Agreement includes a Georgia choice of law provisions and the parties agree Georgia law governs. [4] at 10; [24] at 17. Under Georgia law, the elements for breach of contract are: (1) breach and (2) resultant damages (3) to the party who has the right to complain about the breach. *See Finlay v. Chistriana Trust as Trustee of ARLP Trust 3*, No. 16-cv-1895, 2018 WL

11343485, at *6 (N.D. Ga. June 25, 2018) (citing *Norton v. Budget Rent A Car Sys.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010)).

Defendants argue that WestRock's claim will not succeed for three reasons. First, they maintain that the files at issue are not confidential and therefore could not be protected by the Confidentiality Agreement. [24] at 16. But, as discussed above, the Court finds that WestRock has met its burden to show some of the files constitute trade secrets. Further, the Confidentiality Agreement defines "confidential information" more broadly than just "trade secrets." [1-1] § 2.1. Thus, some of the files may constitute "confidential information" even if they do not warrant trade secret protection. *C.f. SKF USA, Inc. v. Bjerkness* (distinguishing between confidential information and trade secrets and noting that, "an enforceable restrictive covenant may protect material not properly categorized as a trade secret").

Second, Defendants argue that the Confidentiality Agreement lacks consideration and is, therefore, unenforceable. [24] at 17. The Court disagrees. The Confidentiality Agreement provides that the employee enters the agreement "as a condition of, and in consideration for, [ ] employment by WestRock." [1-1] § 1. As WestRock correctly notes, under Georgia law, continued employment of an at-will employee constitutes sufficient consideration for a confidentiality agreement. *See Breed v. Nat. Credit Assn.*, 88 S.E.2d 15 (Ga. 1995).

Third, Defendants argues that WestRock's claim fails because Dillon never signed the Confidentiality Agreement. [24] at 17 n.20; [66] at 18–19. Dillon claims that he only viewed an online confidentiality training module for two minutes and

then checked a box on his computer to "certify that I have read and understand the *WestRock Intellectual Property and Confidentiality Agreement Policy*." [24-2] ¶ 31. Dillon argues that this cannot constitute assent because the Confidentiality Agreement expressly requires Dillon's actual signature and he never signed it. He also argues that the acknowledgment references the "WestRock Intellectual Property and Confidentiality Agreement Policy", yet the Confidentiality Agreement's full title is "Employee Agreement Regarding Confidentiality, Inventions, Works, Computer Software, and Permission." Finally, he argues that the acknowledgement only says that he read and understood a "policy", not that he agreed to be bound by a contract.

Dillon's arguments have considerable merit. A bedrock principle of contract formation requires that every agreement include an offer and acceptance. *See* Ga. Code Ann. § 13-3-1 9 ("To constitute a valid contract, there must be. . .the assent of the parties to the term of the contract"); *Lamb v. Decatur Fed. Sav. & Loan Ass'n*, 411 S.E.2d 527, 529 (Ga. Ct. App. 1991) ("acceptance of an offer must be unconditional, unequivocal, and without variance of any sort; otherwise there can be no meeting of the minds and mutual assent necessary to contract formation."). The Confidentiality Agreement expressly requires a signature. [1-1] at 5.

While Georgia law generally permits one to electronically assent to a contract, *see* O.G.C.A. § 10-12-7, that does not resolve whether Dillon electronically assented to the *Confidentiality Agreement*. Arguably, Dillon only acknowledged that he "read and understood" something, not that he agreed to be bound by it. And, as Defendants argue, the acknowledgement references the "WestRock Intellectual Property and

Confidentiality Agreement Policy", yet the Confidentiality Agreement's full title is "Employee Agreement Regarding Confidentiality, Inventions, Works, Computer Software, and Permission." Adding more confusion, WestRock has a *separate* policy titled "Confidential Information and Trade Secrets", [28-3], and Dillon's training records show he viewed this "Confidential Information and Trade Secrets" policy[12] on the same day he electronically signed the acknowledgement, [28-4].

Based on the record, Plaintiffs have not established that Dillon accepted the agreement. It is possible that future evidence regarding this training module, what Dillon viewed, and how he reviewed it may demonstrate that he accepted the Confidentiality Agreement through his acknowledgement signature. But, at this stage, WestRock fails to demonstrate likelihood of success on the merits. *See Ill. Republican Party*, 973 F.3d at 763 (holding that, a party seeking a preliminary injunction must demonstrate how it "proposes to prove the key elements of its case").

### 3. Breach of Fiduciary Duty/Duty of Loyalty and Tortious Interference Claims (Counts IV & V)

WestRock also argues that it is likely to succeed on its fiduciary duty claim against Dillon and its tortious interference claims against Dillon and CDS.

### a) Preemption under the ITSA

Before turning to the merits of WestRock's claims, the Court addresses a threshold issue: whether the ITSA preempts these claims. According to Defendants, the ITSA wholly preempts them because they just repackage WestRock's trade secret

---

[12] Adding even another layer of confusion, the training records refer to this policy as the "Intellectual Property (IP) and Confidentiality Agreement (Revised)", [28-4] at 4. WestRock's head of IT, Larry Kamp, signed an affidavit that this refers to WestRock's "Confidential Information and Trade Secrets" Policy, [28] ¶¶ 8, 11.

misappropriation claims. [24] at 17–18. If they are preempted, then WestRock certainly cannot demonstrate likelihood of success on the merits of its claims.

The ITSA preempts "conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret," but it does not affect "contractual remedies, whether or not based on misappropriation of a trade secret" or "other civil remedies that are not based upon misappropriation of a trade secret." 765 ILCS 1065/8. WestRock maintains that its fiduciary duty claim is "broader than mere misappropriation and, to the extent they involve trade secrets, are not dependent on the trade secret nature of the information." [63-1] at 15 n.6. Further, citing to *Hecny Transportation, Inc. v. Chu*, 430 F.3d 402 (7th Cir. 2005), WestRock insists that the ITCA does not preempt tort claims based on misappropriation of confidential information that "is not a trade secret." [63-1] at 15.

WestRock partially misconstrues the controlling precedent on ITSA preemption. In *Hecny*, the Seventh Circuit did not resolve whether the ITSA preempts claims for misappropriation of confidential information. Instead, it held that the ITSA does not preempt claims that do not depend on "the existence of competitively significant secret information," such as "claims of theft, fraud, and breach of duty of loyalty that would be sound even if the [complained of information] were a public record." 430 F.3d at 405. Later in *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014), the Seventh Circuit held that "the preemptive language in the ITSA [] cover[s] claims that are essentially claims of trade secret

misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition." 759 F.3d 724, 733 (7th Cir. 2014) (citing *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 619 (Ill. App. Ct. 1998)).

Reading *Hecny* and *Spitz* together, the ITSA preempts claims for misappropriation of confidential information (whether a trade secret or not); but it does not preempt claims that do not hinge on whether the information at issue is confidential. *See, e.g., Market Track, LLC v. Efficient Collaborative Retail Marketing, LLC*, 2015 WL 3637740, at *17 (N.D. Ill. June 11, 2015) (discussing the interplay between *Spitz* and *Hecny* and finding that "the ITSA preempts claims of misappropriation of confidential information even if that information does not rise to the level of a trade secret); *Cronimet Hldgs, Inc. v. Keywell Metals, LLC*, No. 14-CV-3503, 2014 WL 5801414, at *8–9 (N.D. Ill. Nov. 7, 2014) (same).

Given this, the Court examines whether WestRock alleges misconduct other than misappropriation of confidential information and, if so, whether it demonstrates likelihood of success on the merits.

### b) Breach of Fiduciary Duty (Dillon)

For WestRock to establish that Dillon breached a fiduciary duty to WestRock, it must establish that: (1) Dillon owed WestRock a fiduciary duty; (2) Dillon breached that duty; and (3) WestRock suffered damages from that breach. *See Covenant Aviation, LLC v. Berry*, 15 F. Supp. 3d 813, 820 (N.D. Ill. 2014).

In support of its claim for breach of fiduciary duty, WestRock alleges that Dillon (a) misappropriated WestRock's confidential information and trade secrets

without authorization and for the benefit of CDS; and (b) solicited away WestRock's customers while still employed at WestRock. [1] ¶¶ 133(a)–(c).

As to the first, WestRock fails to explain how this "misappropriation" theory does not rely on the confidential nature of the information Dillon took. As such, the ITSA preempts such claims.[13] On the other hand, its "solicitation" theory fares better. Illinois law recognizes that an employee "has a right to enter into competition with its former employer upon leaving" and may even engage in certain preparatory acts while still employed, but he breaches a fiduciary duty to his employer when "he commences business as a rival concern while still employed." *Voss Engineering, Inc. v. Voss Indust., Inc.*, 481 N.E.2d 63, 66 (Ill. App. Ct. 1985) (quoting *Lawter Int'l, Inc. v. Carroll*, 451 N.W.2d 1338 (Ill. App. Ct. 1983)).

WestRock presented evidence that Dillon did just that. The record indicates that he solicited Customer A to leave WestRock while he was still employed with WestRock. Although WestRock alleges that Dillon also misappropriated confidential information to facilitate Customer A's transfer, its breach of fiduciary duty claim does not hinge on misappropriation of confidential information. Based on the current record, WestRock has presented sufficient evidence to support its breach of fiduciary duty claim against Dillon for soliciting Customer A while he was still employed at WestRock.

---

[13] The Court discusses this in more detail in the Motion to Dismiss section of this opinion. *See* § III.B.

### c) Tortious Interference Claim (Dillon and CDS)

WestRock alleges that CDS and Dillon tortiously interfered with its contracts and prospective business by: (a) soliciting away WestRock's customer with whom it had existing, continuing, future, and prospective business, economic, and contractual relations; (b) using WestRock's confidential information and trade secrets to solicit these customers; and (c) knowing that such conduct violates Dillon's Confidentiality Agreement obligations. [1] ¶¶ 140–41.

To establish tortious interference with existing contracts under Illinois law, WestRock must establish: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *See Webb v. Frawley*, 906 F.3d 569 (7th Cir. 2018) (internal citations omitted). For a tortious interference with prospective business claim, WestRock must establish: (1) a reasonable expectancy of entering a valid business relationship; (2) that defendants purposely interfered with that relationship; (3) subsequent defeat of that relationship; and (4) WestRock suffered damages as a result. *See Belden Corp. v. InterNorth, Inc.*, 413 N.E.2d 98, 101 (Ill. App. Ct. 1980). Importantly, although these torts provide some protection against interference in business affairs, Illinois courts caution that "[w]hen a business relationship affords the parties no enforceable expectations, but only the hope of continued benefits. . . they [] have no cause of action against a bona fide competitor unless the circumstances indicate unfair competition." *Id*. at 102.

First, many of WestRock's claims turn on whether Dillon and CDS used confidential information to poach WestRock's customers: "[u]sing WestRock's information, Defendants have contacted WestRock's customers and attempted to end their contractual relationship with WestRock and to establish a relationship with Defendants instead." [5] at 17. The ITSA preempts such theories.

That leaves two other bases for WestRock's claims: (1) tortious interference with the Confidentiality Agreement; and (2) tortious interference with other customer relationships, including Customer A. Based on the current record, WestRock is unlikely to succeed on its claim based on the Confidentiality Agreement. WestRock cannot maintain such a claim against Dillon because "a party to a contract cannot tortiously interfere with its own contract." *PTR, inc. v. Forsyth Racing, Inc.*, 20019 WL 1606970, at *3 (citing *Knickman v. Midland Rush Serv.-Illinois, Inc.*, 700 N.E.2d 458 (Ill. App. Ct. 1998)). With respect to CDS and as discussed above, WestRock has not sufficiently demonstrated that Dillon accepted the Confidentiality Agreement. Thus, it also has not sufficiently established the first element of a tortious interference with contract claim: existence of a valid contract. Further, even though WestRock presented evidence that CDS's president, Rick Bruns, may have known about WestRock's Confidentiality Agreement, it offers only speculation that Bruns (or CDS) knew Dillon took WestRock files in violation of that agreement.

Nevertheless, WestRock has made a sufficient showing on likelihood of success based on improper solicitation as to Customer A. As discussed above, WestRock presented evidence that Dillon solicited Customer A to CDS while still employed at

WestRock. If true, this may constitute a wrongful act sufficient for a tortious interference claim against Dillon. *See Dames & Moore v. Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 825–26 (N.D. Ill. 1998) ("Plaintiff has alleged several wrongful acts, including [] solicitation of plaintiff's clients and employees while he was still employed . . . ."). WestRock also presented evidence that it lost some of Customer A's business to CDS as a result, thus establishing the third and fourth element of its claims against Dillon. As to CDS, there exists scant proof that CDS helped Dillon solicit away Customer A. But the Court finds there is at least *some* circumstantial evidence given the timing and that Dillon began servicing Customer A's accounts as soon as he moved to CDS.

On the other hand, the record is unconvincing with respect to customers other than Customer A. With respect to Customer B, while WestRock has a national contract with Customer B and CDS took some of Customer B's San Antonio business, WestRock does not allege that Customer B has breached the national contract. Thus, WestRock fails to establish a requisite element of tortious interference with contract.

Further, WestRock has not established that Defendants' conduct with respect to Customers B, C, D or anyone else constitutes tortious interference with business relationships. CDS competes with WestRock and may engage in bona fide competition to take WestRock's customers.[14] Dillon did not sign a non-compete

---

[14] With respect to Customer B, WestRock argues Dillon must have shared Customer B's national contract with CDS to facilitate its takeover of the San Antonio business. This, too, remains speculative. Notably, at the evidentiary hearing, Huggins acknowledged that CDS recently solicited away half a dozen WestRock's salespeople from its San Antonio office. *See* [118] at 60:22–61:15. This provides a reasonable (and compelling) explanation for how CDS won Customer B's business.

agreement with WestRock and now remains free to solicit away his former WestRock customers. WestRock offers little more than speculation that they used improper means to win business away from WestRock.[15]

As such, the Court finds that WestRock sufficiently demonstrates likelihood of success on its tortious interference claims against Defendants as to Customer A *only*.

## B.     Irreparable Harm and Remedy at Law

Because WestRock showed some likelihood of success on its misappropriation claims as to Categories 3, 4, and 5, and its breach of fiduciary duty and tortious interference claims regarding Customer A, the Court next considers whether WestRock has shown that it will suffer irreparable harm without an injunction. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1143 (N.D. Ill. 2019). Similarly, it considers whether a "remedy at law is inadequate if damages would not rectify" the harm. *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 427, 437 (N.D. Ill. 2019).

With respect to WestRock's misappropriation claims and as discussed above, the record indicates that Dillon still has access to the files at issue and that he may have misappropriated at least some of them. This demonstrates a likelihood that, absent a court order, he may disclose WestRock's trade secrets in the future. *See*

---

[15] At the evidentiary hearing, WestRock offered emails showing that another WestRock employee, Mr. Vogt (located in WestRock's "Rocky Mountain Region") may have helped CDS sponsor an event for a WestRock customer while he was still employed at WestRock. *See* [107], [108] (Pls' Exs. 100, 101). Huggins testified that Vogt recently joined CDS. [118] at 42:11–45:3. WestRock argues that this shows that CDS improperly interfered with this customer relationship. The emails, however, do not provide sufficient context to evaluate the merits of WestRock's theory. Further, while this may call into question Mr. Vogt's conduct, the evidence does not establish Dillon's involvement.

*Vendavo*, 397 F. Supp. 3d at 1144 (explaining that courts may infer that a defendant who misappropriated trade secrets will likely use those trade secrets again).

Further, WestRock established that some of the files—the purchase history spreadsheets, in particular—may have enduring value to a competitor. With this information, CDS and Dillon may be able to undercut WestRock's prices to take its biggest or most lucrative accounts. The Seventh Circuit has held that such marketplace loss may constitute irreparable harm with no adequate remedy at law. *See Newark Owens Wolf, Inc. v. Owens*, 514 F.3d 630, 632 (7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'"). Given this, WestRock has demonstrated that, absent an appropriate injunction relating to its misappropriation claims, it may suffer irreparable harm that cannot be sufficiently remedied at law.

On the other hand, with respect to the breach of fiduciary duty and tortious interference claims for soliciting Customer A, WestRock fails to explain why monetary damages cannot adequately address this claim.

## C.     Balance of the Harms

Finally, the Court must balance the harm to WestRock of not granting the injunction against the potential harm to Defendants and the public of granting the injunction. *Girl Scouts*, 549 F.3d at 1086. In balancing the harms, this Court employs a sliding scale approach—the more likely WestRock is to succeed on the merits, the less heavily the balance needs to tilt in its favor. *Id.*

To the extent WestRock seeks to enjoin Dillon from disclosing or using WestRock's trade secrets, the potential harm to WestRock outweighs any harm to

45

Dillon.  Such an injunction simply bars Dillon from using information that he has no right to use.  It will not bar Dillon from performing his job for CDS or using legitimate methods to compete for customers.  And such an injunction will not hamper continued competition in this industry or impose any sort of non-compete on Dillon (or CDS) that could harm the public.

Accordingly, the Court enjoins Dillon from disclosing, using or accessing the files listed in Categories 3, 4, and 5, above.  With respect to WestRock's request that the Court also order Dillon and CDS to return the files, submit to certain forensic discovery, and not destroy any documents that may relate to WestRock's claims, the Court already entered an agreed data remediation order [120].[16]  Based on the record, however, the Court will not require WestRock to post a surety bond under Fed. R. Civ. P. 65(c).  Given the narrow injunctive relief and little risk of potential harm to Defendants, the Court finds a bond is not necessary.

## III.    Motion to Dismiss

Pursuant to Rule 12(b)(6), Defendants also moved to dismiss WestRock's complaint in its entirety.  [65].  In deciding a motion to dismiss, the court accepts as true the well-pled allegations in the complaint.  Fed. R. Civ. P. 12(b)(6).  Where the Complaint cites to and relies on documents, the Court may also consider them.  *See Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. College of Wisconsin, Inc.*, 657 F.3d 496, 501 (7th Cir. 2011).

---

[16] The Order [120] requires that the parties share the cost associated with this data remediation. In light of some of the weaknesses in WestRock's claims and given the breadth of the data remediation efforts required by the Order [120], the Court finds such cost-sharing remains appropriate at this stage notwithstanding its decision here.

Defendants' arguments in support of their motion to dismiss mirror many of their arguments in opposition to the preliminary injunction. Yet, unlike WestRock's preliminary injunction motion—where WestRock must demonstrate likelihood of success on the merits—to survive a motion to dismiss, WestRock need only allege "a claim to relief that is plausible on its face." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). That is, the plaintiff must only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court only takes as true well-pled factual allegations, not mere legal conclusions. *Ashcroft*, 556 U.S. at 679 (2009). Looking at WestRock's Complaint through this motion to dismiss lens, the Court grants in part and denies in part Defendants' Motion [65].

## A. Violation of the DTSA and ITSA (Claims II & II)

Defendants move to dismiss WestRock's DTSA and ITSA claims, arguing that: (1) the Complaint makes clear the complained-about information is not confidential as a matter of law, [66] at 6–8, and (2) WestRock fails to allege how it took reasonable measures to protect the information, *id*. at 8–11. The Court already detailed above the requisite elements for a misappropriation claim under the DTSA and ITSA. *See* § II.A.1.

With respect to the confidentiality of the information, to survive a motion to dismiss, a Complaint must point to more than just "broad areas of [information] . . . and assert that something must have been secret." *Composite*

*Marine*, 962 F.d at 1266. But trade secrets "need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *AutoMed Techs.*, 160 F. Supp. 2d at 921 (quoting *Luecadia, Inc. v. Applied Extrusion Techs, Inc.*, 755 F. Supp. 635, 636 (D. Del. 1991)). The Complaint generally alleges that everything Dillon emailed to himself constitutes a trade secret. [1] ¶¶ 57, 73, 82, 87. Such broad generalizations do not suffice. But, as discussed above, § II.A.1.a, the Complaint also provides details about some of these emails and the information contained therein, *id*. ¶ 58, 59. This suffices for purposes of a motion to dismiss. Moreover, Defendants fail to demonstrate that none of this information constitutes a trade secret, as a matter of law. In fact, the Court already found above that some of it may very well constitute trade secrets. As such, Defendants' motion to dismiss on this basis fails.

With respect to WestRock's efforts to guard its confidential information, the Complaint outlines general policies that WestRock has in place to protect its confidential information and alleges, among other things, that it limits access based on need and password protects sensitive information. [1] ¶¶ 17–28. Defendants complain that these allegations do not suffice because the Complaint: (1) does not allege that WestRock restricted its customers from disclosing some of the complained of information, [66] at 12; (2) admits WestRock knew that Dillon retained some of the files after he departed (*i.e.* the customer list he sent to Yates), *id*.; and (3) admits Dillon had broad access to information "beyond what he possibly could have needed

to perform his job", *id*. at 14. Further, Defendants argue that the Complaint's other allegations demonstrate WestRock failed to comply with its own confidentiality policies, *id*. at 13. Finally, they argue that WestRock's delay in filing this lawsuit also demonstrates as a matter of law that WestRock failed to take reasonable measures. *Id*. at 14–15.

The Court disagrees. The Complaint—by discussing WestRock's general confidentiality policies and IT system protections—plausibly alleges that WestRock "reasonably protected" its confidential information. That is all the Complaint must allege to survive a motion to dismiss. The Court addressed Defendants' critiques as part of its preliminary injunction analysis and agrees that some of these points may weaken WestRock's "reasonable efforts" assertions. *See* § II.A.1*, supra*. But these points do not render implausible WestRock's claim that it reasonably protected its files. Nor do these points demonstrate as a matter of law that WestRock failed to take reasonable efforts to protects its confidential information. Instead, this remains a dispute of fact to be resolved upon a full evidentiary record. *Cf. Learning Curve Toys*, 342 F.3d at 723 (holding that disputes over whether something constitutes a trade secret is often a factual question "best resolved by the fact finder after full presentation of evidence form each side").

## B.      Breach of Confidentiality Agreement (Count III)

Next, Dillon moves to dismiss WestRock's claim for breach of the Confidentiality Agreement, arguing that the Complaint—which includes as an exhibit the Confidentiality Agreement and Dillon's electronic "acknowledgement page"—demonstrates that Dillon never signed the Confidentiality Agreement. [66] at

18–19. Dillon, relying on the statute of frauds, argues that this exhibit demonstrates as a matter of law that Dillon never agreed to the Confidentiality Agreement. *Id*. The Court disagrees.

To dismiss a breach of contract claim based on the Georgia's statute of frauds, "it must be clearly apparent from the facts alleged in the Complaint that Plaintiff's claims cannot satisfy the statute of frauds." *Finlay*, 2018 WL 11343485, at *6 (citing *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993). WestRock's complaint alleges that Dillon signed the Confidentiality Agreement and that it "is a valid and enforceable agreement between WestRock and Dillon." [1] ¶¶ 40, 125. As discussed at length above, the Court agrees that there exists an issue of fact regarding whether Dillon's electronic "acknowledgement" constitutes assent. *See* § II.A.2, *supra*. But for purposes of a motion to dismiss, WestRock plausibly alleges that Dillon signed it.[17] Dillon's motion to dismiss the breach of contract claim on this basis fails.

### C. ITSA Preemption of WestRock's Breach of Fiduciary Duty and Tortious Interference Claims (Counts IV & V)

Defendants next argue that the Court should dismiss Plaintiffs' breach of fiduciary duty and tortious interference claims because the ITSA preempts them all.

---

[17] In opposition, WestRock posits two arguments. First, WestRock argues that the signed "acknowledgement" demonstrates as a matter of law that Dillon signed the Confidentiality Agreement because "the electronic transcript…states that 'Employees…are required to sign the [Confidentiality Agreement]' and Dillon signed *right below*, thereby agreeing to the Confidentiality Agreement." [70] at 15 n.3 (emphasis added). Not so. The "requirement" that WestRock references appears in the training module's description, [1-1] at 6, but the record remains unclear whether Dillon signed "right below" it. Second, WestRock argues that Dillon accepted the Confidentiality Agreement by accepting the benefits of continued employment. [70] at 15–16. The Confidentiality Agreement requires a signature, however; it does not state that continued employment constitutes acceptance. As Defendants point out, Georgia law requires that a contract be accepted in the manner specified by it. [66] at 19 (citing *Moreno v. Strickland*, 567 S.E.2d 90 (Ga. Ct. App. 2002)).

50

[66] at 15–16. The Court already detailed the extent of ITSA preemption when it resolved Defendants' similar argument in opposition to Plaintiffs' preliminary injunction motion. *See* § II.A.3, *supra*. As the Court outlined, the ITSA may preempt some but not all of WestRock's claims for breach of fiduciary duty and tortious interference.

For purposes of the motion to dismiss, WestRock responds that its claims are "broader than mere misappropriation and, to the extent they involve trade secrets, are not dependent on the trade secret nature of the information." [70] at 19. The Court agrees to an extent. As discussed above, WestRock's allegations as to Customer A do not hinge on the use of confidential information.

On the other hand, Plaintiffs' other bases for its claims appear to hinge on the confidentiality of the information at issue. The Complaint alleges that Dillon breached his fiduciary duties by "planning to" and then actually "email[ing], copy[ing], retain[ing], us[ing], disclos[ing] and otherwise misappropriate[ing] WestRock's confidential information and trades secrets." [1] ¶ 133(b)–(c). Similarly, it alleges that Dillon and CDS tortiously interfered with its customer contracts and business relationships by "using WestRock's confidential information and trade secrets to solicit WestRock's customers." *Id*. ¶ 140(b). Further, the Complaint alleges that "but for the use by Dillon and CDS's use of WestRock's confidential information and trade secrets, these and other WestRock customers would have continued their contracts/current business relationship with WestRock." *Id*. ¶ 95. Given this,, WestRock's allegations as to customer solicitation (other than Customer A) hinge on

misappropriation of confidential information. In view of *Spitz*, 759 F.3d at 733—which is binding on this Court—the ITSA preempts such claims.

In sum, the Court partially grants Defendants' motion to dismiss Plaintiffs' breach of fiduciary duty (Count IV) and tortious interference (Count V) claims. It dismisses these claims *without prejudice* to the extent they are based on Defendants' alleged solicitation of customers other than Customer A and *with prejudice* to the extent they are based on Defendants' alleged use or disclosure of WestRock's confidential information.

### D. Whether WestRock Sufficiently Alleges Injury or Causation

Finally, Defendants argue that Plaintiffs' contract, fiduciary duty, and tortious interferences claims also fail because the Complaint: (1) does not adequately allege that Dillon ever used or disclosed confidential information to anyone; and (2) fails to tie their alleged injury—diminished business from a few customers—to any wrongful conduct by Defendants. [66] at 12–14. Defendants' arguments are unavailing.

As to Defendants' first argument, the Confidentiality Agreement defines a breach more broadly than the improper use or disclosure of confidential information. [1-1]. Failure to return confidential information may suffice. *Id.*, § 2.3. Defendants allege just that. [1] ¶ 127(c); *see also* [70] at 16. Defendants also allege that Dillon's personal email use violated the Confidentiality Agreement. [1] ¶ 127(d); [70] at 11. This remains a disputed issue of fact, but these allegations suffice to survive a motion to dismiss the breach of contract claim. Regarding breach of fiduciary duty and tortious interference, because the ITSA preempts WestRock's claims that hinge on Defendants' use or disclosure of confidential information, the Court need not reach

52

whether the Complaint sufficiently alleges that Dillon used or disclosed confidential information.

As to whether WestRock sufficiently alleges injury from breach of the Confidentiality Agreement, WestRock alleges it lost customer business and attributes this loss, on information and belief, to Dillon taking and using its confidential information in violation of the Confidentiality Agreement. *See* [1] ¶¶ 71–73, 81–95, 127–29. Although "information and belief" may not always suffice to survive a motion to dismiss, courts recognize that an employer rarely has direct evidence of an employee's improper use and disclosure at the outset of misappropriation litigation. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001). The Complaint alleges that Dillon still has the information at issue; outlines how Dillon took some of it (*e.g.* accessing WestRock's systems after he quit); and alleges that soon after Dillon took the information and quit, WestRock lost business to Dillon and CDS. [1] ¶¶ 75–99. This may not be enough to show "likelihood of success" in proving that Dillon used or disclosed this information. But it plausibly alleges injury to survive a motion to dismiss. *See, e.g., General Electric Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 829 (N.D. Ill. 2019) (denying a motion to dismiss breach of confidentiality agreement based on similar allegations because the allegations "support a plausible claim that the defendants improperly used information covered by their Agreements").

Finally, with respect to injury and WestRock's breach of fiduciary duty and tortious interference claims, WestRock's alleges it lost Customer A's business. [1] ¶¶ 75–79. This sufficiently alleges injury tied to the alleged misconduct.

## IV. Conclusion

For the reasons stated above, the Court grants in part and denies in part Plaintiffs' Motion for Preliminary Injunction [4]. It also grants in part and denies in part Defendants' Motion to Dismiss. [65].

Dated: December 22, 2021

Entered:

John Robert Blakey
United States District Judge